No. 82,590

STATE OF KANSAS, *Appellee*, v. JEROME G. CARTER, *Appellant*.

(14 P.3d 1138)

Opinion filed December 15, 2000.

*Reid T. Nelson*, assistant appellate defender, argued the cause, and *Elizabeth Seale Cateforis*, special appellate defender, *Kirk C. Redmond*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with him on the briefs for appellant.

*Charles R. Reimer*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Jerome G. Carter was convicted by a jury of first-degree murder, aggravated robbery, and criminal possession of a firearm. He received a hard 40 sentence plus 199 months. He appeals his convictions and sentence.

Troy Hawkins, Jr., died on March 10, 1998, of gunshot wounds. The fatal wounds were caused by a bullet that entered the upper left part of his head and exited on the lower right part and by a bullet that went through his left cheek downward into his neck. He sustained nonfatal gunshot wounds to his upper chest and left arm.

Cavelle Horn and Hawkins shared a two-bedroom house at 1332 N. Erie in Wichita. On March 9, Horn got home from work shortly after 5 p.m. Hawkins and their friend, Carlos Johnson, arrived between 9 and 10 p.m. Later, while Hawkins and Johnson were in the living room watching television and playing video games, Horn dozed off in his bedroom. Horn was awakened by voices. He propped himself up to look into the living room to see who was there. Horn saw a stranger, an African-American male, "kind of tall," wearing a big coat, and with braided hair. Horn identified the defendant, Jerome Carter, as the stranger. Defendant was talking to Hawkins about his pit bull terriers.

After awhile, Horn heard the defendant say, "This is a jack," meaning that it was a robbery. Defendant and Hawkins came to the door of Horn's bedroom, someone switched on the light, and Hawkins told Horn to get up. Horn remained motionless. Horn got pushed down on the floor, and Hawkins was pushed down beside him. The defendant put a gun to Horn's eye and asked where the money was. Horn denied having any money.

Defendant opened Horn's closet and took a pair of shoes. He also took from Horn's room a cellular phone and the detachable face plate of Horn's car stereo.

Horn heard another person come in the front door. Then defendant and the second intruder, later identified as Lelandra Sweeney, brought Johnson into Horn's bedroom and forced him to lie face down on the floor with Horn and Hawkins. To get the intruders to leave, Horn told the defendant to take his car. Defendant left the house with Horn's keys.

After defendant left the house, Hawkins told Horn and Johnson that the intruders only had one gun. They got up and caught Sweeney in the living room. They locked the door and began beating the unarmed intruder. They beat him with a baseball bat and a metal pipe.

Defendant tried to get back into the house through the locked front door. He broke out the glass in the door, and he kicked the door slightly ajar. Horn and Johnson ran out the back door, but Hawkins stayed to continue beating Sweeney.

Horn ran around toward the front of the house. He saw the defendant with his arm reaching in through the door. Horn heard 5 or 6 shots in quick succession.

Johnson testified that he did not know either Carter or Sweeney. Johnson was in the backyard when he heard gunshots.

When police arrived, they found a set of keys dangling from the trunk of Horn's car, which was parked in front of the house. The dead bolt of the front door was engaged, but the door was ajar. A pager that belonged to Sweeney was found in front of the house.

Cassandra Smith, whose preliminary examination testimony was admitted at trial, testified that Carter was her boyfriend. On March 9, 1998, Carter borrowed her car, a 1994 Taurus. When Carter returned to Smith's apartment, he brought Sweeney with him and Sweeney was injured. The following day Smith drove Sweeney to the Minor Emergency Center and dropped him off.

When Sweeney left the Minor Emergency Center, he got a ride to the vicinity of 31st and Arkansas. Sweeney was arrested later that day at his sister's residence on 33rd Street.

Sweeney's sister went to Smith's residence to tell Smith and Carter that Sweeney had been taken into custody. Smith drove Carter to his aunt's residence near 10th and Grove, drove to her mother's house in the 1300 block of Erie and left her children there, and then returned to Carter's aunt's house.

Smith testified that Sweeney put a gun on her dresser the night before. The defendant told her to get rid of it. Smith had a girlfriend pick her up at a pay phone approximately 3 blocks from Carter's aunt's place. They went to the garage at 10th and Grove, where Smith got the gun from the garage. As Smith's girlfriend

was driving her away from the area, police stopped the car and found a gun underneath Smith's car seat.

A ballistics expert tested the gun. He testified that spent casings found inside and outside the front door of Horn and Hawkins' house and a bullet fragment recovered from a wall of the house were fired from the gun.

A designer jacket recovered from the closet at Carter's aunt's residence had blood stains on it. DNA testing of the stains showed that Hawkins could not be excluded as a source of the stains.

Carter first argues that his Sixth Amendment right to counsel was violated by defense counsel's presenting a theory of defense to the jury that was inconsistent with the defendant's claim of innocence.

At trial, Carter was represented by an assistant public defender. On appeal, the argument is made that a new trial is required because trial counsel refused to present defendant's asserted defense, which was that he was innocent. Carter denied any part in the charged offenses; in statements to the jury, defense counsel conceded Carter's involvement but denied that he premeditated the shooting of Troy Hawkins. In other words, with Carter charged alternatively with premeditated first-degree murder or felony murder, defense counsel's strategy was to direct the jurors toward a felony-murder conviction rather than a premeditated first-degree murder conviction. There was no defense evidence; the State's evidence placed Carter in the midst of the robbery and identified him as the person who shot and killed the victim. Defense counsel's thinking undoubtedly was that his client's conviction of one of the murder charges was inevitable so that his effort ought to be directed to lessening the penalty potential. A hard 40 sentence may be imposed on a conviction of premeditated but not felony murder. K.S.A. 1999 Supp. 21-4635(a). Hence, defense counsel urged the jury to view Carter's killing of Hawkins as an incident of the robbery rather than as a premeditated act.

After the jury had been selected, defense counsel complained on Carter's behalf to the trial court judge that Carter did not want to proceed to trial using defense counsel's strategy. Defendant himself told the trial court judge that he did not believe that his

appointed counsel was representing him "to the best of his ability" and therefore should be removed from the case. The judge told Carter that, because the jury had been sworn in and was waiting to hear the evidence, the trial would not be postponed for the purpose of changing counsel. Carter's choices were to proceed with defense counsel representing him or to represent himself.

Carter did not like either alternative. He told the trial court he did not want to be represented by defense counsel, nor did he want to represent himself. The trial court judge then inquired about the grounds for Carter's dissatisfaction with counsel. Defendant said:

"It's like—I feel that he's on a level—he wants me to make a determination—he said that he feels that this is in my best interest for me to go the way that he wants to go. I totally disagree with that.

"I feel like there were things like—you know—I've been here like eight months. I only seen this man like five times, you know.

"And on the other levels, I'd actually like to file for a speedy trial. And he told me that I cannot file for a speedy trial. And he told me that I cannot file for a speedy trial because I have another charge which is a parole hold. But I have not been violated. My parole hold is due to the fact on this case. So my speedy trial was never filed.

"Like my mom talked to him. He gave her nothing but negative feedback. Gave me nothing. He already convicted me guilty and on my innocence. And he's already convicted me. And what kind of right is that? It seems like I'm going against two DAs. This is my life. And I don't feel comfortable proceeding with this trial with my life in this man's hands when he's against me.

"And you asked me a question, if you could stop—if you could stop me representing myself at any time, dealing with my lack of understanding. I don't have a law degree in this, but he says he do. But even if you find that I'm not capable of continuing in court and you put him back on there, after—after—I'm pretty sure he's not agreeing with the things I'm saying with him. But this is what I feel with my heart, and, therefore, there's some stimulation basis constituted toward me right there. And I feel he has a bias attitude by not going with what I feel. This is my life. Not his life. He's telling me—in other words, I feel it is unjust. In other words, he seem like—he's making his decision by the best of his ability, what he says. But, to me, from my common sense, that's not right. That ain't right. And I don't feel comfortable with proceeding on in trial with somebody like that, that's supposed to have a law degree, but, to me, is incompetent of what he doing.

"I've been to the law library a couple of times. That don't make me no genius. But it seems like he's working against me and not for me.

"I've been here eight months. I've only seen him five times. Out of the time I see him, they're no more than 10 minutes at a time. This is my life. A Hard 40 case. It don't seem like he's really interested in this. Therefore, he's not interested because it's not his life. And if it has to be a decision between me and his life, if it's a fight for my life, it would be me because it's my life. It's not him, you know. So if it's got to be between me and him, I'd rather be me. Even though, due to my incompetence, I don't know what I'm doing. But he don't know what he's doing to me—not to me. And, therefore, I feel right there like my rights have been violated."

The trial judge asked Carter if there were an attorney he could hire that day. Carter said there was not. The judge denied defendant's request for a new attorney. The judge then advised the defendant what he might expect if he were to represent himself. He asked Carter if he wished to represent himself, and the defendant responded:

"It's not my desire to represent myself. But it is not—it is my desire to notify you to let you know that this man is not representing me to the best of his ability. I do not want to represent myself. I'm asking you—I'm asking you, would you—would you give me another lawyer? But it's not my desire to represent myself."

The trial court noted that there was no motion by defense counsel to withdraw as counsel, announced that defendant's motion to represent himself would be denied, and stated that they would proceed immediately with trial.

During opening statement, defense counsel told the jurors that the evidence would show that "Carter is not guilty of premeditated murder." Counsel stated:

"What happened in this case is somewhat as the State has described it. There was a robbery. And it was a robbery that went horribly wrong. But there was never a premeditated murder that took place. And Troy Hawkins did die as a result of those gunshots. What happened is that Mr. Carter and Mr. Sweeney both went to this place, and a robbery did take place.

"I'm not here to tell you that Mr. Carter is some kind of saint, that he's completely innocent of everything here. But I am here to tell you that in no way was this death premeditated. And the State's evidence that they're going to present will show you exactly that."

Defense counsel continued in this vein, describing the unfolding events and Carter's involvement in them. He told the jurors that "Carter brandished a weapon" and "shots were fired." Defense

counsel concluded by telling the jurors that Carter's "actions were stupid, and they were a product of rage and panic, but it was not a premeditated killing of Troy Hawkins."

After the State's sixth witness testified, the court recessed. Before the jury returned to the courtroom, defense counsel informed the trial court judge that Carter wished to make a record of his "disagreement, for lack of a better word, of trial strategy in regards to specifically denying being there, yes, and informing the jury that we believe that while he committed the offense, it was not a premeditated offense. I believe Mr. Carter disagrees with that trial strategy."

Defendant asked to speak for himself and became angry when the trial judge denied the request, saying, "[Y]ou are represented by counsel here in this courtroom." This exchange occurred before the defendant was taken out of the courtroom:

"THE DEFENDANT: Man. If this man is telling the jury that I'm guilty—
"THE COURT: Take him out.
"THE DEFENDANT: If he's already telling them I'm guilty, and I'm telling him to tell them that I'm innocent, how are we going to proceed with this trial? Get your hands off of me."

When Carter was returned to the courtroom, the trial judge said to him: "Mr. Carter, you do have an attorney here. He has been appointed to represent you. He will continue to represent you in this trial. Any discussion with this Court will be through the benefit of your attorney." The trial judge also advised Carter that any further outbursts would result in his being removed from the courtroom for the duration of the evidence. Defense counsel stated: "Mr. Carter wishes me to express his displeasure to the Court that I've chosen a trial strategy different from what he had wanted." The trial judge stated that the disagreement already had "been made clear to this court." The jury returned to the courtroom, and testimony resumed.

No defense witnesses were called. Defendant offered no exhibits.

In his closing statement, defense counsel told the jury that the only issue was premeditation. He recounted evidence that Sweeney was lying passively while he was being struck, and then he said:

"And the evidence is Mr. Carter must have seen that, and that's how he reacted. He reacted in a criminal way. But he did not act in a premeditated way."

The defendant interrupted counsel: "How can he say that? I'm going—that's my own lawyer. That's my own lawyer. How the hell can he say that? That's bull shit. This is my lawyer. Shit. You might as well find me fucking guilty already. My own fucking lawyer."

At the trial judge's direction, Carter was removed from the courtroom. Defense counsel continued describing Carter's involvement in the robbery and emphasizing that the homicide was not premeditated.

The State contends that the court should not consider this constitutional claim because it is raised for the first time on appeal. Examination of the trial transcript shows that Carter voiced his dissatisfaction with his trial counsel on several occasions. Carter did not couch his complaints in precise constitutional terms. Because, as a layperson, he could not have been expected to frame the issue in constitutional concepts, his plainspoken complaints during trial sufficiently raised the issue. Carter's constitutional claims are basically premised on ineffective assistance of counsel.

As a general rule, we would not consider a defendant's assertion of ineffective assistance of counsel before the trial court has had an opportunity to assess the performance of counsel. See *Chamberlain v. State*, 236 Kan. 650, 659, 694 P.2d 468 (1985). However, such assessment by the trial court is not necessary where the record on appeal is sufficiently complete for this court to decide the issue in a direct appeal. Here, the acts of counsel that Carter relies on are not disputed and are clearly reflected in the record. It would serve no purpose to remand to resolve the issue. The record on appeal is sufficient for this court to consider Carter's constitutional claims, including ineffective assistance of counsel.

Immediately after the jury was sworn was the only time defendant was given an opportunity to explain to the trial court judge why he objected to being represented by defense counsel. Although somewhat veiled and nearly overshadowed by general complaints, there is in Carter's remarks the substance of the complaint he makes here—"[defense counsel] said that he feels that this is in

my best interest for me to go the way that he wants to go. I totally disagree with that." Carter's comments and outbursts during trial echo the mixed sentiments of his statement to the court, but they also include clear statements of his assertion of innocence and the conflict with the picture painted for the jury by his counsel.

The trial judge was made aware of the issue. Although defendant specified no constitutional provision in the trial court, justice would require in the circumstances that the constitutional question be considered on appeal. See *State v. Mincey*, 265 Kan. 257, 267, 963 P.2d 403 (1998).

On appeal, Carter contends that his right to assert his innocence is a fundamental right, that he was deprived of that fundamental right when his appointed attorney told the jury that Carter was involved in the robbery and shooting, and that the denial of his fundamental right requires reversal of his convictions. According to the State, what is at issue is a matter of defense strategy rather than a fundamental right, and strategic decisions are the province of counsel rather than of the defendant. For the proposition that defense counsel has wide latitude in tactical decisions, the State cites *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In other words, the State's argument seems to be that this is a question of effective assistance of counsel and that defense counsel provided reasonably effective assistance, which is what is required under the two-part test announced in *Strickland*. See *Chamberlain*, 236 Kan. at Syl. ¶ 3 (adopting the *Strickland* formulation).

The State presumably concludes that defense counsel's assistance passed muster, and even if it did not, there was no prejudice, the second part of the test. The second part of the test is whether there is a reasonable probability of a different result with effective assistance. All witness accounts and all scientific evidence support the charges against Carter. The defense presented no evidence. In these circumstances, there would seem to be no reasonable probability of defendant's showing that, but for trial counsel's statements of his client's involvement, the jury would have found that he was not guilty as charged.

Carter argues that the two-part test for effective assistance of counsel is not applicable. He contends that trial counsel's telling the jury that his client was involved in the robbery and shooting when the client denied involvement transcends mere ineffective assistance of counsel. Rather than being a matter of devising a legal defense, this is an instance of faithless counsel telling the jury that his client, who maintains his innocence, is not innocent. He contends that his right to have his counsel present his defense of innocence and not tell the jurors that he was involved in the crimes is inviolable.

We find support for Carter's argument in *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984), issued the same day as *Strickland*. Although overturning the Court of Appeals' reversal of Cronic's convictions, the Supreme Court held that in certain circumstances ineffective assistance of counsel may be presumed. In other words, defense counsel's conduct could require reversal without a showing of prejudice.

Cronic was charged along with two associates of multiple counts of mail fraud in a multimillion-dollar check-kiting scheme. The Government's investigation took years and included review of thousands of documents. Cronic's retained attorney withdrew and was replaced approximately a month before trial by inexperienced appointed counsel. Co-defendants testified for the government. Cronic was convicted of 11 of 13 counts and sentenced to serve 25 years. The Court of Appeals based its reversal on five criteria—(1) time for investigation and preparation, (2) experience of counsel, (3) gravity of the charges, (4) complexity of possible defenses, and (5) accessibility of witnesses to counsel. The Supreme Court disapproved the test because it could require reversal "even if the lawyer's actual performance was flawless." 466 U.S. at 652-53.

A test the Supreme Court would have endorsed is one that would "demonstrate that counsel failed to function in any meaningful sense as the Government's adversary." 466 U.S. at 666. Counsel's role in our adversarial system was the Court's focus:

"The substance of the Constitution's guarantee of the effective assistance of counsel is illuminated by reference to its underlying purpose. '[T]ruth,' Lord Eldon said, 'is best discovered by powerful statements on both sides of the question.'

This dictum describes the unique strength of our system of criminal justice. 'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' [Citation omitted.] It is that 'very premise' that underlies and gives meaning to the Sixth Amendment. It 'is meant to assure fairness in the adversary criminal process.' [Citation omitted.] Unless the accused receives the effective assistance of counsel, 'a serious risk of injustice infects the trial itself.' [Citation omitted.]

"Thus, the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' [Citation omitted.] The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." 466 U.S. at 655-57.

This reasoning would require reversal in circumstances where counsel sufficiently betrays a client.

There has not been a flood of reversed convictions in the wake of *Cronic*. Courts generally have declined to follow or extend *Cronic*. For example, considering the role of appellate counsel, the Colorado Supreme Court stated: "The Supreme Court itself has suggested in dicta that in some circumstances the performance of counsel might be so deficient that prejudice may be presumed to have resulted therefrom." *People v. Valdez*, 789 P.2d 406, 410 (Colo. 1990). The Colorado court applied the *Strickland* test, expressing the view that the *Cronic* approach "offers no flexibility for situations in which the integrity of the appellate process is not affected by the deficient performance of appellate counsel." 789 P.2d at 410. It could be said, however, that flexibility to ensure integrity of the process, as distinguished from the result, is what the *Cronic* approach does offer.

In *People v. Nunez*, 263 Ill. App. 3d 740, 747, 635 N.E.2d 718 (1994), the court rejected defendant's reliance on *Cronic* in claiming that his counsel was ineffective for failing to conduct meaningful cross-examination of prosecution witnesses and for calling defendant as a witness and eliciting inculpatory testimony from him. After careful review of the record, the court announced that it was

satisfied that the State's case was subjected to a meaningful adversarial testing. The court added: "This was not an instance where defense counsel conceded defendant's guilt and failed to provide an effective defense." 263 Ill. App. 3d at 754.

*Cronic* was relied on by a federal Court of Appeals in granting relief in *U.S. v. Swanson*, 943 F.2d 1070 (9th Cir. 1991). In *Swanson*, defense counsel conceded in closing argument the only disputed facts. The court concluded: "[W]e must reverse because counsel's abandonment of his client's defense caused a breakdown in our adversarial system of justice." 943 F.2d at 1071. The Court of Appeals found that the due process requirement that guilt be proved beyond a reasonable doubt had been undermined and that defense counsel's conduct had "caused a breakdown in our adversarial system of justice." 943 F.2d at 1073-74. The Court of Appeals concluded that the latter ground "compels an application of the *Cronic* exception to the *Strickland* requirement of a showing that the outcome of the trial would have been different without counsel's errors or omissions." 943 F.2d at 1074. One member of the panel expressed his view in dissent that defense counsel's conduct was not as reprehensible as the majority depicted it. 943 F.2d at 1079.

Carter cites *Mulligan v. Kemp*, 771 F.2d 1436 (11th Cir. 1985), as holding that "counsel has a constitutional obligation to comply with the defendant's decision to present a particular defense," but it really does not stand for that proposition. The question considered by the federal Court of Appeals was whether counsel's relying on what his client told him in lieu of proper investigation constituted ineffective assistance of counsel.

However, the court prefaced its analysis of the ineffective assistance of counsel claim with the following observations on the attorney/client relationship in criminal matters:

"At the start, we note the defendant's Sixth Amendment rights are his alone, and that trial counsel, while held to a standard of 'reasonable effectiveness,' is still only an *assistant* to the defendant and not the master of the defense. *See Faretta v. California*, 422 U.S. 806, 820, 95 S. Ct. 2525, 2533, 45 L. Ed. 2d 562 (1975). Our criminal system allows a defendant the choice of whether he wants to be represented by counsel at trial. *See generally Faretta*. Because we recognize that a

defendant must have this broad power to dictate the manner in which he is tried, it follows that, in evaluating strategic choices of trial counsel, we must give great deference to choices which are made under the explicit direction of the client. . . . This is not to say that an attorney has no professional independence to act without the explicit permission of his client. Rather, if he is commanded by his client to present a certain defense, and if he does thoroughly explain the potential problems with the suggested approach, then his ultimate decision to follow the client's will may not be lightly disturbed." 771 F.2d at 1441- 42.

Carter cites several cases in which courts have decided that counsel must respect a client's decision whether or not to assert an insanity defense. In each of these cases, the question was couched in terms of effective assistance of counsel. None involved trial counsel overruling the client's wishes. Instead, in each instance, trial counsel's abiding by his client's wishes was challenged and upheld in habeas proceedings.

Carter relies rather heavily on cases involving the right of a criminal defendant to self-representation. He cites *McKaskle v. Wiggins*, 465 U.S. 168, 181-88, 79 L. Ed. 2d 122, 104 S. Ct. 944 (1984) (unsolicited comments by "standby counsel" in presence of the jury did not unduly undermine pro se defendant's right to self-representation); *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975) (Sixth Amendment guarantees a criminal the right to conduct his or her own defense); and *United States v. Plattner*, 330 F.2d 271 (2d Cir. 1964) (criminal defendant has a constitutional right to act pro se). Carter's contention is that the express and implied constitutional guarantees that add up to an accused's right to manage and conduct his or her own criminal defense require this court to hold that defense counsel's confounding his client's defensive position requires reversal of the judgment.

As previously noted in this opinion, the State's response is that what is at issue is not a fundamental right but trial tactics. In support of its argument, the State cites *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972), which provides:

"In the conduct of the defense of a criminal case the technical and professional decisions, which require trained professional skill and judgment, must rest with the lawyer. The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be

made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client."

We have no quarrel with the above syllabus paragraph; however, we do not agree that defense counsel's conduct was based on trial tactics or strategy. The first syllabus paragraph of *Winter* states:

"In the control and direction of a criminal case certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are: (1) what plea to enter; (2) whether to waive jury trial; and (3) whether to testify in his own behalf." 210 Kan. 597, Syl. ¶ 1.

In *Faretta*, the Supreme Court spoke to the rights of a defendant under the Sixth Amendment, stating:

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' " 422 U.S. at 819.

In *Treece v. State*, 313 Md. 665, 547 A.2d 1054 (1988), a long line of lower court decisions was overturned when the appellate court held that a criminal defendant who is competent is entitled to decide whether to assert the defense of lack of criminal responsibility. The rationale of the earlier cases had been that counsel has full say to make tactical decisions. It was decided that the rationale of *Faretta*, instead, should govern and should shift authority for the decision whether to assert an insanity defense from counsel to the defendant. In *Faretta*, the United States Supreme Court held that a criminal defendant who intelligently and voluntarily chooses to represent himself or herself cannot be compelled to be represented by counsel. The Maryland court observed:

"The Court recognized the importance of counsel to fair trial; it affirmed the right of every defendant, rich or poor, to the assistance of counsel; but it held that a defendant who intelligently and voluntarily chooses to represent himself cannot be compelled to be represented by counsel. Justice Stewart explained for the Court:

'The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is

to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." ' " *Treece*, 313 Md. at 673-74 (quoting *Faretta*, 422 U.S. at 834).

Although the issue is not the same, the above reasoning is applicable and persuasive in the present case. In *Brookhart v. Janis*, 384 U.S. 1, 16 L. Ed. 2d 314, 86 S. Ct. 1245 (1966), the Supreme Court spoke directly to the decisions a defendant makes regardless of the views of his counsel. Brookhart stated to the court, "I would like to point out in no way am I pleading guilty to this charge." 384 U.S. at 6. Defense counsel subsequently requested a prima facie trial rather than a complete trial. The Supreme Court concluded counsel's request was "the equivalent of a guilty plea and  .  .  .  he would not have the right to be confronted with and cross-examine the witnesses against him." 384 U.S. at 7. The Court held:

"Brookhart personally interjected his statement that 'I would like to point out in no way am I pleading guilty to this charge.' Although he expressly waived his right to a jury trial, he never, at any time, either explicitly or implicitly, pleaded guilty. His emphatic statement to the judge that 'in no way am I pleading guilty' negatives any purpose on his part to agree to have his case tried on the basis of the State's proving a prima facie case which both the trial court and the State Supreme Court held was the practical equivalent of a plea of guilty. Our question therefore narrows down to whether counsel has power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him. We hold that the constitutional rights of a defendant cannot be waived by his counsel under such circumstances." 384 U.S. at 7.

Viewing defense counsel's conduct as part of a trial strategy or tactic is to ignore the obvious. By such conduct defense counsel was betraying the defendant by deliberately overriding his plea of not guilty. He not only denied Carter the right to conduct his defense, but, as in *Brookhart*, it was the equivalent to entering a plea of guilty. To allow the defense counsel to argue to the jury that Carter is guilty while Carter is verbally maintaining his innocence violates his Sixth Amendment right to counsel and interferes with his due process right to a fair trial.

Defense counsel had no right to conduct a defense premised on guilt over his client's objection. If defense counsel could not accept

Carter's rejection of such a defense, then he should have either proceeded with a defense acceptable to Carter or sought permission to withdraw as defense counsel. Defense counsel did neither.

The trial court was wrong in concluding the decision was tactical and was for counsel and not Carter to make. The trial court was aware of the conflict between Carter and his counsel and denied Carter's request to appoint different counsel to represent him. Carter's request may have been untimely, but that was not due to the fault of the defendant. Absent appointing new counsel, the trial court should have made it clear to defense counsel that he could not proceed with a guilt-based defense against Carter's wishes.

The decision to enter a plea of guilty or not guilty to a criminal charge lies solely with the defendant. It is a fundamental constitutional right guaranteed to a defendant, and defense counsel's imposing a guilt-based defense against Carter's wishes violated his Sixth Amendment right to counsel and denied him a fair trial. Carter's plea of not guilty required the State to prove guilt beyond a reasonable doubt. Defense counsel's conduct relieved the State of that burden. Defense counsel abandoned his client, and the result was a breakdown in our adversarial system of justice. As in *Swanson,* such a breakdown compels application of the *Cronic* exception. The conduct of defense counsel was inherently prejudicial, and no separate showing of prejudice was required. As this court recently stated: "The assistance of counsel is among those constitutional rights so basic to a fair trial that their denial can never be treated as harmless error." *State v. Jenkins,* 257 Kan. 1074, Syl. ¶ 2, 898 P.2d. 1121 (1995). We have no other alternative except to grant Carter a new trial.

Since we have determined that Carter is entitled to a new trial, we need only consider one other issue which could arise in a retrial. Carter complains that the district court abused its discretion in admitting certain testimony of the murder victim's father. In May 1998, this court issued its opinion in *State v. Donesay,* 265 Kan. 60, 959 P.2d 862 (1998), reversing a jury conviction of premeditated murder and a hard 40 sentence. The court stated that it had no choice but to reverse because "[t]he district attorney's insistence in presenting [the widow's] testimony to the jury, and the trial

court's allowing her to do it, affected the substantial rights of the defendant to a fair and impartial trial." 265 Kan. at 89. With regard to the materiality of the widow's testimony, the court observed:

"The purpose of the State's eliciting Mrs. Easter's testimony was not to identify the defendant as the killer, was not to show that he intended to kill Officer Easter, and was not to show premeditation. Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended to infuriate and inflame the jury against the defendant." 265 Kan. at 89.

In October 1998, the present case was tried. Like *Donesay*, it was tried in Sedgwick County. Although the father's testimony is much briefer and less inflammatory than the widow's in *Donesay*, it is nevertheless immaterial and served only to inflame the jury against the defendant. The State concedes that other evidence established the identity of the victim, his death, and his close relationship with his dogs.

The State fails to mention the *Donesay* case in its brief. We direct the State's attention to the following principle stated in *Donesay*:

"The admission of evidence in a murder trial regarding the victim's family, the victim's relationship with a spouse or family member and friends, the victim's character, and the details of the victim's last days before death which has been intentionally and not incidentally elicited by the prosecuting attorney during the trial, is patently improper and reversible error." 265 Kan. 60, Syl. ¶ 9.

Reversed and remanded for new trial.