No. 116,422

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of D.H., Jr.,

A Minor Child.

SYLLABUS BY THE COURT

1.

The rules pertaining to the termination of parental rights are reviewed and applied.

2.

Indian children are in a special category when it comes to child in need of care proceedings. In Kansas, a child in need of care proceeding is generally governed by the Revised Kansas Code for Care of Children, except in those instances when the court knows or has reason to know that an Indian child is involved in the proceeding, in which case, the Indian Child Welfare Act applies.

3.

If there is any reason to believe a child is an Indian child, the agency and state court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe.

4.

Where the court knows or has reason to know that an Indian child is involved in a child in need of care proceeding, the party seeking the termination of parental rights to an Indian child shall notify the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of the tribe's right of intervention.

1

The notice requirement includes providing responses to requests for additional information, where available, in the event that a tribe indicates that such information is necessary to determine whether a child is an Indian child.

Appeal from Meade District Court; VAN Z. HAMPTON, judge. Opinion filed August 4, 2017. Affirmed in part and remanded with directions.

*J. Scott James*, of Greensburg, for appellant natural mother.

*Robert J. Kennington*, of Garden City, for appellant natural father.

*Laura H. Lewis*, county attorney, for appellee.

Before HILL, P.J., MCANANY and ATCHESON, JJ.

HILL, J.:  In this appeal of the severance of their parental rights to their son, D.H., Jr., Mother and Father primarily claim that things were turning around for them and the court jumped the gun and severed their rights prematurely. Father claims a deep emotional bond with his son and that the evidence did not compel termination of his rights at this point. Mother also raises claims of incompetent counsel at one of the initial hearings where she stipulated that this child was in need of care. She also complains about lack of sufficient notice to the Cherokee Indian Nation.

Our review reveals that the evidence in this record supports termination of their parental rights, and we affirm the termination. While it is true that Mother's first counsel was incompetent as she claims, he was soon replaced and the case went forward for a long time where Mother had proper professional legal assistance. Her parental rights were severed because of her continued use of methamphetamine, not because of the

misdeeds of her first lawyer. Under these circumstances, she has failed to show prejudice to her case from the lawyer's deficient representation.

We do, however, remand the case to the district court for additional information to be sent to the Cherokee Indian Nation to determine with certainty whether this is an Indian child. The Indian Child Welfare Act and Kansas law require proper notices to be sent to the Indian Nations. This means that when there is an inquiry from a Nation for additional information, the law expects reasonable efforts by the State to supply that information. We hold that this was not done here, and we remand the case to the district court with directions.

Because of their separation, Mother and Father no longer speak with a common voice. They are represented by separate counsel and pursue unique avenues for reversal of the district court's decision. Even so, much of the evidence dealt with their common roles as parents and we will review that evidence collectively. But where the arguments take separate paths, we will address their issues separately.

*The rules that control this case are well settled.*

Our statutes that focus on children in need of care create a system where those children in distress will receive the relief they need for their young lives as they are unable to provide for themselves. The statutes provide help, supervision, and assistance for their parents, who for many and various reasons, cannot or do not provide for their children. Services in support of the family are provided, as needed, to the children and their parents. Physical, medical, mental, and social evaluations of all members of a family are frequently obtained. Classes and counseling are often available. All of these efforts are expended primarily for the safety and well-being of the child, and when the child is removed from the home, the efforts focus on reunification of the family.

Repairs to broken lives and families, however, can take time—even years. But the law and our Supreme Court both recognize that the formative years for children are brief and if parents cannot or will not make changes in their lives to accommodate the return of their child, the district court will terminate their parental rights if it is in the best interests of their child to do so.

A district court may terminate parental rights only after a child has been found to be a child in need of care and the court finds by clear and convincing evidence that:

- the parent or parents are unfit and unable to care properly for a child;
- the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future; and
- it is in the best interests of the child to terminate parental rights. See K.S.A. 2016 Supp. 38-2269(a) and (g)(1).

Various statutes set out the criteria a judge must consider when deciding termination questions. When deciding unfitness of a parent, the court must consider a list of factors in K.S.A. 2016 Supp. 38-2269(b) and any other factors the court deems appropriate. When the child is not in the parents' physical custody—such as the case here—the court must also consider four additional factors listed in K.S.A. 2016 Supp. 38-2269(c). Proof of any one of these factors may establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f). In deciding whether termination of parental rights is in the best interests of the child, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2016 Supp. 38-2269(g)(1). The passage of time for improvement must be taken into account because we deal with young, impressionable lives. These children in need of care, indeed, are not children for long.

4

For our part, when we review a district court's termination of parental rights, the law requires us to consider whether, after our review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could find it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated. In making this determination, this court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). We now briefly review the evidence of the problems experienced by this family. More of the facts will be related later when we explain our holding.

*Drug usage dominated this family.*

Life did not start well for this child. The day after D.H., Jr., was born in November 2012, the staff at the hospital reported to the Department for Children and Families that Mother was using methamphetamine while she was pregnant with this child. When services were offered to the family, they refused and the case was closed.

After that, life for this family was far from tranquil. In May 2013, the Department received a report that Mother and Father were using drugs and the child was home alone. They moved to Meade County and they bounced around from house to house. Crisis followed crisis. They were in frequent contact with the police for domestic disturbances. They admitted using methamphetamine. They were evicted. They fought with each other with the child present. They moved in with a man and left their child with him without telling him they were going or when or if they would return.

They experienced financial distress. Jill Burtzloff, the assigned social worker, stated she was never able to verify whether the parents were employed. Neither Father nor Mother held down a job during this time.

5

Serious legal complications arose in their lives. The State charged Mother and Father with possession of drug paraphernalia. Later, the State filed an additional charge against Father for domestic battery because he grabbed Mother around the neck during an argument. Father pled no contest to disorderly conduct, and the court issued a no contact order restraining him from Mother. With this background information we turn to these legal proceedings.

This child in need of care case started when both parents were arrested for bond violations in November 2014 and both tested positive for methamphetamine. Their bonds were revoked. This meant incarceration for the pair. With both parents in jail and no other place for D.H., Jr., to go, the State filed a petition to find him to be a child in need of care. The court placed him in the Department's custody. He would never again reside at his parents' home.

*Some successes were followed by many failures for the parents.*

Neither unexpectedly nor unreasonably, the juvenile court wanted both parents to be drug free when they spent time with their child and ordered that they were to have a clean drug screen before having any contact with their child. This proved to be a high hurdle.

First, with no explanation in the record, the parents did not attend the case planning conference. With a goal of reintegration of the family, the court adopted a case plan that set out tasks for the parents, such as:

- refrain from the use of illegal drugs;
- obtain stable housing and employment;
- complete a domestic violence assessment;
- take parenting classes;

6

- seek a mental health intake; and

- participate in couples' therapy.

The court also expected the parents to follow all recommendations made in the various assessments. The court placed the child with his paternal grandmother.

These tasks were beyond their reach. The next month, in December 2014, both parents tested positive for methamphetamine. Later that month, at the adjudication hearing, neither parent contested the State's allegations that their child was a child in need of care. Mother alleges some misconduct of her court-appointed attorney at this hearing that we will deal with when we address her issues on appeal.

The ups and downs of the parents' behaviors became manifest after this. On the positive side, in January 2015, Mother and Father completed inpatient drug rehabilitation programs. But later, in June 2015, Mother was unsuccessfully discharged from outpatient treatment. Similarly, Father was also unsuccessful with outpatient treatment.

To their credit, Mother and Father had clean drug screens in February, March, and April 2015. At this point, both parents had regular visits with their child during this time. The parents completed a domestic violence assessment. Mother completed parenting classes. These positives were followed by negatives.

In May 2015, for three consecutive weeks, the parents did not show up for drug screens. At the next case plan conference held later that month, it was clear that Mother and Father had not completed most of their assigned case plan tasks. The parents did not provide pay stubs to verify employment. Mother said she was working at Applebee's and Spencer Browns, and then temporarily at National Beef with Father. Father worked odd jobs. Mother also said she was employed by caring for Glen Lucas, who was on

7

disability. The parents were ordered to pay child support but never did. The parents did not complete any more case plan tasks from May to October 2015.

Apparently, their drug usage was sporadic but frequent because the parents were drug free for their September drug test and had a visit with the child. But when both parents tested positive for methamphetamine in late October, the Department changed the case plan goal from reintegration to adoption. Despite the change of goal, on November 9, 2015, both parents had a visit with their child. After that, neither parent submitted to a drug screen until February 2016. In March 2016, Father began cooperating with drug screens again.

After the case plan goal changed, the State moved to terminate parental rights since there had been no real efforts by either parent to correct their conduct or circumstances in any significant way. When that motion was filed on April 1, 2016, Mother began cooperating and promptly entered drug treatment in mid-April. But nothing really improved.

Methamphetamine was their master. At Mother's diversion revocation hearing in one of her criminal cases, she tested positive for methamphetamine. Mother had tested positive for methamphetamine again at Stepping Stone Shelter on May 6, 2016. Headed in a similar direction, in April 2016, Father had a revocation hearing in his criminal case after he tested positive for methamphetamine. Meanwhile, contact with their child was minimal. Father had a visit with him in March and again in April 2016. Mother had two visits with him in May 2016.

Meanwhile, while his parents struggled unsuccessfully with their apparent drug addiction, their child remained in the Department's custody. This child had been out of his parents' house since November 3, 2014, with no overnight visits with the parents even attempted. Cara Payton, a reintegration social worker, testified that the parents did not put

effort into completing the case plan. They went through cycles of drug use, domestic violence, poverty, and homelessness. As the date of a court hearing approached, there would be some cooperation from them. But after court, the cooperation fizzled out. The parents did not make any changes necessary to break those cycles. Payton recommended that the child be freed from their ties and prepared for adoption.

*We note some additional facts that arose from the termination hearing.*

Basically, the termination hearing evidence painted a sad picture of these parents. The court took judicial notice of three worthless check cases filed against Mother in Meade County and a charge of unlawful possession of controlled substances against Mother in Seward County. The court also took judicial notice of a pending theft charge against Father in Dodge City. The court also noted that Mother had her parental rights to five other children severed in California.

Nonetheless, both parents claimed improvement in their circumstances. At the time of the severance hearing, Mother was in drug treatment at the Women's Recovery Center. Father testified that during the pendency of this case he did not have a driving license, which hindered his employment. At the time of the hearing, he testified he was employed and had a driving license. He was enrolled in Cimarron Basin outpatient treatment. He leased a duplex and his brother owned a house that was set aside for him.

At the conclusion of the hearing, the court ruled that despite their good intentions, the parents were unfit due to their drug addiction. The court found that it was in the best interests of this child to "get someone to care for him that will provide a life for him." The court terminated both parents' rights and directed the Department to place the child for adoption. At this point, we look first at Father's issues and then turn to those raised by Mother.

9

*The evidence supports the court's termination of Father's parental rights.*

To us, Father argues that at the time of the termination hearing he "had a reality check" and he was getting ready to take responsibility for his life and setting the stage to have his child reintegrated back into his life. Life had been difficult for him during this period, and the State agencies did not help.

Actually, Father contends that it was the Department who failed to make reasonable efforts to rehabilitate the family because it did not perform a walk-through of his home or complete drug screens. In other words, it had not, as required by law, extended reasonable efforts to help restore their relationship. Father argues he made efforts to obtain employment and stay clean. But he offers no real explanation why these alleged Department deficiencies prevented him from completing his case plan tasks. Nor does he explain how these deficiencies kept him using drugs.

The fact of the matter is that Father's efforts to regain the custody of his son were not sufficient. The testimony showed that Father tested positive for methamphetamine at various times over the course of the proceedings. Father's inability to have overnight visits with his son was not based on the Department's failures, but rather on his own inability to stay drug-free for a time. Father simply did not show up for drug tests and could not be reached by the Department. He failed to maintain steady employment and failed to complete many of the other case plan tasks. This attempt to now place blame on the Department for his failures underscores Father's fundamental inability to take responsibility for making the necessary changes in his life to ensure his son's return.

In an attempt to make a claim about the emotional health of his son, Father contends that he had a tight emotional bond with him. In making this claim, he refers to Mother's testimony that the child loved Father and to his own testimony that he felt he had an emotional bond with him. Father also refers us to testimony that both he and

10

Mother had a couple of months of good visits with the child and started having unsupervised visits at the end of April or beginning of May 2015. He does not mention his drug usage that followed those two months.

As support, Father cites this passage from *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010):

> "The statutory requirement directs the court to give primary consideration to the physical, mental, and emotional health of the children. In so doing, the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children."

We have no quarrel with the quoted passage—in fact, it makes good sense.

But that case is far different than this. We note that in *In re K.R.*, there was no allegation of addiction or abuse and the guardian ad litem "vigorously" advocated against the termination of the mother's parental rights because of the mother's relationship with the children and the children's desire to be with their mother. The *K.R.* panel found the best interests of the children were not served by termination of their mother's parental rights. 43 Kan. App. 2d at 904-05. To the contrary, here, the guardian ad litem concurred with the State's motion to terminate parental rights. Father's self-serving statement that he had a bond with his son is not conclusive evidence of that bond. Nor does his claim persuade us that it overcomes in some way the evidence of the long periods in this child's young life where Father had no contact with him. A parent's role is to protect, cherish, comfort, support, guide, nurture, and help—this record reveals that Father has failed, for whatever reason, to fulfill this role.

11

Our review of the record revealed that both parents had addiction issues that continuously prevented them from seeing their child. The unsupervised visits that began at the end of April or beginning of May 2015 were short-lived and not even overnight. Despite Father's ability to have good visits when he was clean and sober, Father did not stay that way for long. We reiterate, in May 2015, the parents did not show up for drug screens for three consecutive weeks. In June 2015, the visits were stopped. Two years with no overnight visits is a long time for one so young.

The child was very young when removed from the parents' home. At this point, the child has spent more time out of Father's home than in his home. Father has made insufficient efforts to change his circumstances to make room for his child. Despite his claims of a close bond with the child, his continued drug usage, which prevented his contact with the child, was clearly not the fault of the social service agencies involved. When we view this evidence in the light most favorable to the State, as the law requires, we are convinced that a rational factfinder could find by clear and convincing evidence that Father was unfit and it is in the best interests of the child to terminate his parental rights. We turn now to issues raised by Mother.

*The evidence supports termination of Mother's parental rights.*

Arguing that she made key changes to her life prior to the termination hearing, Mother contends that the court improperly concluded that her conduct was unlikely to change in the foreseeable future. After all, on her own initiative, just before the termination hearing, Mother entered into a women's recovery program and stayed clean and sober while there. Also, Mother no longer had contact with Father, who was a bad influence; and she had obtained stable housing in Garden City.

Our review of the record reveals a remarkably similar pattern of drug addiction, lack of change of circumstances, and disinterest in this child by Mother as well as Father.

The court's journal entry illustrates that pattern, where the court found Mother and Father were unfit and the conduct or condition that rendered the parents unfit was unlikely to change in the foreseeable future. The record supports that finding. The court ruled that despite their good intentions, their addiction rendered them unable to adjust their circumstances toward reintegration. The court found a high risk that Mother would be in jail for a long period of time because of crimes she was charged with.

In our review, we note that one of the social workers testified that the parents did not put effort into completing the case plan. They went through cycles of drug use, domestic violence, poverty, and homelessness. Then it would get to a court hearing and there would be some cooperation. But after court, the cooperation fizzled out. The parents did not make changes to break those cycles. The termination hearing was no different.

The court found two statutory factors created a presumption that Mother was unfit:

- K.S.A. 2016 Supp. 38-2271(a)(1)—A parent has previously been found to be an unfit parent under comparable proceedings under the laws of another jurisdiction;
- K.S.A. 2016 Supp. 38-2271(a)(3)—On two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care.

These presumptions must not be ignored. The statute, K.S.A. 2016 Supp. 38-2271(b), dealing with the burden of proof when a presumption of unfitness is presented to the court, states clearly that the burden of proof is on the parent to rebut the presumptions of unfitness by a preponderance of the evidence. We find no evidence in the record presented by Mother to rebut either of these presumptions.

Looking at this evidence in the light most favorable to the State, as the law requires, we hold the evidence in this record is clear and convincing that Mother is unfit

13

by reason of conduct or condition which renders her unable to care properly for this child and her conduct is unlikely to change in the foreseeable future. Additionally, the record supports the court's finding that this termination is in the best interests of this child.

*We examine Mother's claims about her first court-appointed lawyer.*

Three attorneys have represented Mother at various times in this proceeding—two court-appointed and one retained. Initially, Dan Arkell-Roca represented Mother. According to the proffered testimony at the district court's hearing on this matter, Arkell-Roca obtained Mother's signature on her no-contest statement to the State's child in need of care petition by folding over the paper in such a way that she could only see the signature line. She was not able to view the rest of the document. Arkell-Roca told Mother that she needed to sign the document if she wanted to get her child back and she did not need to worry about what it said. She signed the statement without reading it and not knowing what it said. Arkell-Roca also advised Mother that she should not pursue the issue of whether there was native parentage of her son because the tribe would come and "take her child away."

There is no record of the adjudication hearing where both parents stipulated that their child was in need of care. The record does reflect that about 6 months later—in June 2015, the parents asked that Arkell-Roca be removed since they had retained Derek Miller who appeared in the case for both parents. When the parents separated Miller withdrew and the court appointed Jaskamal Dhillon to represent Mother at the termination hearing.

The Kansas Supreme Court disbarred Arkell-Roca from the practice of law in Kansas on July 7, 2016. See *In re Arkell*, 304 Kan. 754, 377 P.3d 414 (2016).

When it addressed this issue, the district court found that Arkell-Roca's representation was by definition below the standard of representation expected of an attorney and, as such, would ordinarily call for reversal. But three reasons convinced the court that the poor representation did not prejudice Mother's case:

- Arkell-Roca's inadequate performance did not change the outcome of the case. Evidence of Mother's continued use of methamphetamine would certainly have been presented at any adjudication hearing and that, alone, would independently justify a finding that the child was in need of care.
- Arkell-Roca's deficient performance was cured by his removal and Mother's representation by Derek Miller, and then Jaskamal Dhillon. Dhillon represented Mother at the time of the termination hearing.
- At the termination hearing, clear and convincing evidence proved the parents were unfit.

We find the court's reasoning persuasive, but first we must review the applicable law.

The law is clear—in order to prevail on a claim of ineffective assistance of counsel, the party alleging ineffective assistance must establish that the performance of counsel was deficient and the party was prejudiced by the ineffective assistance. This means that there is a reasonable probability a different result would have been achieved in the absence of the deficient performance. See *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015); *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

Mother does not dispute the court's finding that no prejudice resulted. Instead, in her attack on this ruling, Mother contends that she need not prove prejudice because her no-contest statement was procured by "outright fraud." With such an action, prejudice must be presumed. For support, Mother cites a criminal case, *State v. Carter*, 270 Kan. 426, 14 P.3d 1138 (2000), where the client received incompetent legal assistance.

15

In *Carter*, a defendant was charged with premediated first-degree murder. Against the defendant's strong objections, defense counsel pursued a strategy of directing the jury toward a felony-murder conviction rather than a premediated first-degree murder conviction. Defense counsel presented no evidence. Counsel essentially argued that the defendant was guilty of killing the victim but that there was no premeditation. Meanwhile, the defendant maintained his innocence. The court held:

> "Under the facts of this case, defense counsel's imposing a guilt-based defense against defendant's wishes violated defendant's fundamental right to enter a plea of not guilty and deprived the defendant of effective assistance of counsel that was prejudicial per se; thus no showing that the outcome of the trial would have been different absent defense counsel's conduct was required." 270 Kan. 426, Syl. ¶ 4.

*Carter* is based on the so-called *Cronic* exception. In *Cronic*-type cases where an attorney's performance completely denied the defendant assistance of counsel or denied it at a critical stage of the proceedings, the court may presume prejudice. See *Sola-Morales*, 300 Kan. at 883 (citing *United States v. Cronic*, 466 U.S. 648, 658-59, 104 S. Ct. 2039, 80 L. Ed. 2d 657 [1984]). With such a complete denial of competent legal assistance, nothing else need be proved. But application of the *Cronic* exception is rare.

Turning from criminal cases to cases involving juveniles, the court's expectations for competent legal assistance are similar. Simply put, parents are entitled to effective assistance of counsel during a termination of parental rights hearing. The standards used in context of the Sixth Amendment to the United States Constitution apply. *In re Rushing*, 9 Kan. App. 2d 541, 545, 684 P.2d 445 (1984). In *Rushing*, the court did apply the *Cronic* exception to the parental severance case because the father's attorney left the courtroom "mid-trial" and was not present during much of the evidentiary hearing, the evidence of father's unfitness was "marginal at best," and the attorney made no argument to the trial judge concerning the sufficiency of the evidence. 9 Kan. App. 2d at 547.

16

We do, however, question the continued value of the holding in *Carter* because of doubts created in *Edgar v. State*, 294 Kan. 828, 841-42, 283 P.3d 152 (2012). In *Edgar*, our Supreme Court cited two United States Supreme Court cases that declined to apply the older *Cronic* exception. 294 Kan. at 842. Clearly, the court could have automatically reversed based on *Cronic* and refused to do so.

Here, Mother asks us to apply the *Cronic* exception to a child in need of care determination in which counsel pursued a "no contest" strategy without consulting Mother. Because of this, in her view, Mother was denied effective assistance of counsel at a critical stage. We have no doubt that Arkell-Roca's conduct was well below the permissible conduct for attorneys. Certainly, there is no excuse for the attorney's actions.

But that misconduct occurred very early in these proceedings. Therefore, in our view, it was possible to perform a prejudice analysis, as the court did here to see if outright reversal is called for. Arkell-Roca was dismissed from this case well before the State sought termination of Mother's parental rights. Months of case plan hearings, review hearings, and visits occurred before the issue of termination even arose. Mother subjected the State's case to meaningful adversarial testing during the termination hearing. Clearly, Mother has not claimed she was innocent as Carter claimed because she never denied that she tested positive for methamphetamine on several occasions. We see no reason to follow the *Cronic* ruling and instead consider all of the circumstances of this case. After all, we are involved in a question of what is in the best interests of this child. The district court properly ruled that Mother failed to show prejudice due to her ineffective attorney at such an early stage of this proceeding.

*We are troubled by the lack of response to a request for information from the Cherokee Nation.*

Early on in these proceedings, D.H., Jr.'s paternal grandmother stated in an affidavit that the boy was eligible for membership with an Indian tribe. Accordingly, the State sent notice to the Cherokee Nation. The Cherokee Nation responded:

> "Cherokee Nation Indian Child Welfare has examined the tribal records regarding the above named child/children and none of the names provided can be found as current enrolled members.

> "**The child/children does not meet the definition of 'Indian child' in relation to the Cherokee Nation as stated in the Federal Indian Child Welfare Act, 25 U.S.C. § 1903(4). Therefore, the Cherokee Nation does not have legal standing to intervene based on the information exactly as provided by you. Any incorrect or omitted information could invalidate this determination.**

> ****************************

> "Because 'ENROLLED TRIBAL MEMBER' and 'ELIGIBLE FOR ENROLLMENT' are different, a conclusive finding of 'eligible for enrollment' requires the full names, to include maiden names, and dates of birth for the direct biological lineage linking the child to an enrolled member of the tribe. It is impossible for Cherokee Nation to confirm or deny a claim of 'eligible for enrollment' without this information.

> "If you wish to send additional information, please respond in writing with the additional lineage . . . ."

Importantly, the dates of birth of D.H., Jr., Mother, and Father were listed at the top of the letter but the paternal grandmother's birth date was listed as "????????" The State took no further steps in regards to the Indian Child Welfare Act after receipt of this letter.

On appeal, Mother contends that the State's notice to the Nation of the Act omitted important information—the maiden name, birthdate, and direct lineage of the paternal grandmother. In reply, the State argues "that it was not necessary to provide any further notice or information to the Cherokee Nation as there was not any further information to be had and the tribe had indicated that the State had complied with the notice requirements of ICWA."

Obviously, the application of and compliance with the Act are questions of law over which we exercise unlimited review. *In re A.J.S.*, 288 Kan. 429, 431, 204 P.3d 543 (2009).

It is important to recognize that Indian children are in a special category when it comes to juvenile proceedings. In Kansas, a child in need of care proceeding is generally governed by the Revised Kansas Code for Care of Children, K.S.A. 2016 Supp. 38-2201 *et seq.*, "'except in those instances when the court knows or has reason to know that an Indian child is involved in the proceeding, in which case, the Indian child welfare act of 1978, 25 U.S.C. § 1901 *et seq*., applies.'" *In re M.F.*, 290 Kan. 142, 148-49, 225 P.3d 1177 (2010) (quoting K.S.A. 2008 Supp. 38-2203(a). An "'Indian child' means any unmarried person who is under age eighteen and either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (2012). The question of jurisdiction arises.

Tribal courts have exclusive jurisdiction over proceedings involving children residing on or domiciled within a reservation and concurrent jurisdiction with state courts over foster care or termination of parental rights proceedings involving children not domiciled on a reservation. See *In re M.F.*, 290 Kan. at 149 (citing 25 U.S.C. § 1911[a] [2006]).

19

Before an Indian parent's rights to an Indian child may be terminated, two steps must be taken by the trial court:

- the clear and convincing evidence standard set forth in state law must be proven;
- then the evidence must establish beyond a reasonable doubt that termination is required. *In re S.M.H.*, 33 Kan. App. 2d 424, 431, 103 P.3d 976, *rev. denied* 279 Kan. 1006 (2005).

If the evidence suggests the court is dealing with an Indian child, as with the grandmother's affidavit here, the court must consider the child to be an Indian child until the tribe advises otherwise. The Bureau of Indian Affairs Guidelines, in effect at the time of the termination of parental rights here, control here. They state, "If there is any reason to believe the child is an Indian child, the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe." BIA Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 FR 10146, Section A.3(d) (February 25, 2015).

Notice to the tribe is mandatory under the Act

"where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify . . . the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." 25 U.S.C. § 1912(a) (2012).

The notice shall include the following information, if known:

"(1) Name of the Indian child, the child's birthdate and birthplace.
"(2) Name of Indian tribe(s) in which the child is enrolled or may be eligible for enrollment.

"(3) All names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information.

"(4) A copy of the petition, complaint or other document by which the proceeding was initiated." 25 C.F.R. § 23.11 (d) (2014).

Thus, according to the regulation, the State had to provide the paternal grandmother's maiden name and birthdate "if known."

Regarding the notification requirements, the BIA Guidelines state that "[t]he notice requirement includes providing responses to requests for additional information, where available, in the event that a tribe indicates that such information is necessary to determine whether a child is an Indian child." BIA Guidelines, Section B.6(l).

Our research has disclosed that other states have considered similar issues and held that furnishing additional information is mandatory. When a Texas appellate court found that the notices provided to an Indian tribe were deficient, it remanded the case so that notice could be sent in compliance with the Act. *In re R.R., Jr.*, 294 S.W.3d 213, 237 (Tex. App. 2009). Additionally, the California appellate courts have addressed the issue and stated that "[w]hen the notice contains insufficient information, it is effectively meaningless . . . because the failure to give proper notice forecloses participation by interested Indian tribes . . . ." *In re Ethan M.*, No. F053868, 2008 WL 683601, at *4 (Cal. App. 2008) (unpublished opinion). We find that reasoning cogent and persuasive. What is true in California is true in Kansas.

Here, there is no indication the State knew the grandmother's birthdate and maiden name, even though the child lived with grandmother after she was approved for placement. The State admits in its brief that it took no action to obtain the information

21

after receiving the Cherokee Nation letter. Thus, we cannot reasonably say that the information was unavailable here. In our view, the letter from the Cherokee Nation can be treated as a request for more information. There were eight question marks in place of the grandmother's date of birth, indicating this information was needed.

Simply put, the Cherokee Nation letter does not provide a definitive answer to whether D.H., Jr., was eligible for enrollment in the Cherokee Nation. And, according to the guidelines, "the agency and State court must treat the child as an Indian child, unless and until it is determined that the child is not a member or is not eligible for membership in an Indian tribe." BIA Guidelines, Section A.3(d). The court must consider this child to be an Indian child until the Cherokee Nation rules that he is not.

Finally, unique to this case, we must point out that even if we do not require the State to provide additional information to the tribe, Mother has a strong argument for remand because her attorney, since disbarred, advised her not to pursue a notice to the Nation under the Act.

*Conclusion*

There is sufficient evidence, in quantity and quality, to support a finding that both parents are unfit and it is in the best interests of the child to terminate their parental rights. We remand this matter to the district court to determine, after proper notice to the Cherokee Nation, if this child is, according to the Nation, an Indian child. If the district court finds, based on proper evidence, that this child is not an Indian child, then the termination of the parents' rights need not be set aside. In that instance, the district court can simply find that the Act does not apply and reaffirm its prior decision terminating parental rights. But if this child is an Indian child, then the district court is directed to set aside the termination of parental rights and all further proceedings shall be governed by the provisions of the Act.

22

Affirmed in part and remanded with directions.