IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,323

STATE OF KANSAS,
*Appellee*,

v.

RACHAEL C. HILYARD,
*Appellant*.

SYLLABUS BY THE COURT

1.

Premeditation may be shown by circumstantial evidence, provided inferences from that evidence are reasonable.

2.

Sufficient evidence, even circumstantial, need not rise to such a degree of certainty that it excludes any and every other reasonable conclusion.

3.

A defendant must consent to the use of a guilt-based defense, but that consent need not be on the record.

4.

Absent a request from the defendant, this court need not remand a case for an evidentiary hearing to resolve an ineffective assistance claim raised for the first time on direct appeal.

1

5.

During closing arguments, a prosecutor does not shift the burden of proof to the defendant by pointing out a lack of evidence either to support a defense or to corroborate a defendant's argument about deficiencies in the State's case. Nor does a prosecutor shift the burden of proof by mentioning the lack of evidence to rebut testimony and other evidence presented by the State.

6.

A jury determines the weight and credit to be given the testimony of each witness. While prosecutors are not allowed to offer personal opinions on credibility, a prosecutor may suggest legitimate factors for the jury to consider when assessing witness credibility.

7.

K.S.A. 2021 Supp. 22-3429 imposes no affirmative duty for courts to raise the issue of whether to order a mental examination. If the issue is raised, the decision of whether to order such mental examination is discretionary.

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed August 19, 2022. Affirmed.

*Randall L. Hodgkinson,* of the Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

2

The opinion of the court was delivered by

WILSON, J.: This is Rachael Hilyard's direct appeal after the district court imposed a hard 50 prison sentence for her first-degree premeditated murder conviction. Hilyard appeals on several theories, including insufficient evidence to support premeditation, erroneous jury instruction, ineffective assistance of counsel, prosecutorial error, and the district court's abuse of discretion. For the reasons discussed below, we affirm Hilyard's conviction and sentence.

FACTS AND PROCEDURAL HISTORY

In April 2017, then 9-year-old J.G. accompanied his grandmother, Micki Davis, to the home of Rachael Hilyard, his dad's ex-girlfriend. Davis had received a phone call from Hilyard to pick up J.G.'s dad's things or Hilyard would leave them at the curb. While gathering those things at Hilyard's home, Hilyard and Davis got into a fight. According to J.G., Hilyard suddenly pushed Davis from behind and began attacking her.

As soon as J.G. saw the attack, he ran to Davis' pickup parked in the driveway, locked himself inside, and called 911. While J.G. was in the truck, Hilyard approached the truck and talked to J.G., asking him to let her in. She eventually left to go back into the house.

J.G. left the truck and began running. He eventually stopped at the home of Brandon Martinez, who was out in his garage. Martinez took over the 911 phone call for J.G., and law enforcement soon arrived. With J.G. safely in the patrol vehicle, Officers Crouch and Spicuglia tried to make contact at Hilyard's house by knocking on the front door, looking through windows, and trying the back door—all with no response. Finally,

3

Officer Spicuglia lifted the single-stall garage door. Inside, he saw a female body near a large pool of blood. The body's head was missing.

Officer Crouch moved to cover the perimeter of the house to contain whatever evidence and suspects might be in the residence until more officers could arrive. When more officers arrived on the scene, they entered the house and found Hilyard on the floor of the bathroom. Hilyard immediately complied with all the officers' verbal commands. She did not have any weapons and did not resist officers as they took her into custody. The officers then found Davis' head in the kitchen sink. CSI collected two bloody kitchen knives from near Davis' body.

While being transported, Hilyard overheard some radio traffic where the dispatch gave the incorrect address for her home; without prompting, Hilyard coherently gave the officers her correct address. After being placed in an interrogation room, Hilyard made an unprompted statement to an officer to the effect of "this is my fault."

During an autopsy, the coroner found bruises on Davis' head, face, breast, and lower back, as well as eight fractured ribs: all evidence of blunt force trauma. The coroner testified there was no way to know whether someone had lost consciousness based only on this type of bruising; but it was possible. The coroner then detailed the sharp force injuries to Davis' neck; he could not tell exactly how many stab wounds there were but was confident it was not just one uninterrupted cut through the neck. The coroner explained that to sever the head from a torso, one must use significant effort. The coroner also said he found blood in Davis' lungs, leading him to believe she was still breathing while her throat was cut. Ultimately, the coroner ruled the cause of death was sharp force injuries through the neck.

4

The physical evidence found in Hilyard's garage also suggested Davis was likely alive while being decapitated. Crime scene investigators found blood spatters at the scene which they believed had been caused by arterial spray—which generally requires an amount of blood pressure or a pumping heart.

Hilyard was charged with first-degree premeditated murder. Initially, she was found incompetent to stand trial and was ordered to undergo treatment at Larned State Security Hospital. After treatment and a competency evaluation from Larned, the district court found Hilyard competent to stand trial.

During the defense's opening statement, counsel acknowledged this was not a "whodunit" case; there was no issue about who killed Davis. Rather, defense counsel told the jury "when you have all of the evidence, I expect you will render a guilty verdict to my client on the appropriate charge."

Hilyard testified as part of her defense. She acknowledged she was expecting Davis and J.G. to pick up some of her ex-boyfriend's things and said she'd known Davis for probably 20 years. While discussing a painting Hilyard wanted to give to Davis, Hilyard thought Davis flinched at her. She "reacted," and they wrestled from the adjoining laundry room into the garage, where Hilyard believed J.G. to be. Hilyard admitted Davis did not touch her before the scuffle. Hilyard did not perceive Davis as a threat but was "on edge" because she thought someone was coming to kill her. Hilyard did not remember the details of the fight, but she knew she and Davis wrestled to the garage. Contrary to the blunt force injuries found during the autopsy, Hilyard denied remembering punching Davis at all. She did remember both herself and Davis "resisting."

5

Hilyard remembered J.G. running out of the garage during the fight. Hilyard testified that when the fight ended, Davis was lying on the garage floor. She avoided looking at Davis because she feared someone was watching her—Hilyard—through her own eyes. She closed the garage door.

Hilyard testified that she then went into the house looking for J.G. Upon realizing he was not in the house, she walked outside and found him in the truck. She approached the truck and was confused as to why he was so scared; Hilyard told J.G. he did not need to be scared. J.G. told Hilyard he was calling 911, at which point Hilyard returned to the house.

Hilyard explained that once she was back in the house, she got one knife and went back out into the garage. She testified she did not know Davis was still alive, nor did she know Davis was breathing. But Hilyard also testified she went to the garage "to go make sure [Davis] was okay still" . . . "'cuz [Hilyard] thought [Davis] was gonna get back up."

Hilyard then began severing Davis' head because "things" told Hilyard she had little time and she needed to get Davis' head away from her body so her soul could get free and go to heaven. As Hilyard was cutting through Davis' neck, the first knife broke. She had to stop and go get another knife from the kitchen. After severing Davis' head, Hilyard walked into the kitchen and placed Davis' head in the sink. Then she went into the bathroom, where she believed she stayed until the police arrived.

During closing, defense counsel again summed up its position as, "[m]y client killed Ms. Davis, but there's no premeditation." Counsel supported this by highlighting Hilyard's belief that Davis was already dead. Other than Hilyard's own testimony, defense counsel presented no evidence.

6

The court instructed the jury on three lesser included offenses, but the jury ultimately convicted Hilyard of premeditated first-degree murder. The district court sentenced Hilyard to life in prison with no chance of parole for 50 years. Hilyard filed a timely notice of appeal.

ANALYSIS

SUFFICIENCY OF THE EVIDENCE

Hilyard's first issue on appeal is whether there was sufficient evidence to support the jury's finding of premeditation. She argues there was not. We find sufficient evidence in the record to support a finding of premeditation and no error below.

*Preservation*

Generally, there is no requirement for a criminal defendant to challenge the sufficiency of the evidence before the trial court to preserve it for appeal. *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008). We find no exception in this case to that general rule.

*Standard of Review*

There must be evidence supporting each element of a crime to meet the sufficiency of the evidence standard. An appellate court reviews sufficiency by looking at all the evidence in a light most favorable to the prosecution to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In

7

making that determination, the appellate court will not reweigh evidence, evaluate witness credibility, or resolve conflicts in the evidence. *State v. Gonzalez*, 307 Kan. 575, 586, 412 P.3d 968 (2018).

*Discussion*

"Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct." *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516 (2001). Thus, Hilyard argues she could not have formed premeditation unless she knew, or reasonably should have known, that Davis was still alive before Hilyard dealt the fatal cut.

Premeditation need not be proved by direct evidence. Premeditation may be shown by circumstantial evidence, provided inferences are reasonable. Our caselaw identifies five factors to consider when deciding whether circumstantial evidence gives rise to an inference of premeditation: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.'" *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 (2014) (quoting *State v. Scaife,* 286 Kan. 614, 617-18, 186 P.3d 755 [2008]). Inferences reasonably drawn are not driven by the number of factors present in a particular case, because in some cases one factor alone may be compelling evidence of premeditation. See *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008).

It is not improper for a conviction to be sustained by circumstantial evidence, and if there is substantial evidence this court will not disturb a guilty verdict. Sufficient evidence, even circumstantial, need not rise to such a degree of certainty that it excludes

any and every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Hilyard focuses simply on her contention that the State did not prove, even circumstantially, she knew Davis was alive when she delivered the fatal cut. While Davis may have been alive but unconscious, Hilyard claims no evidence showed she knew or reasonably could have known Davis was alive. This argument focuses on the fifth factor above: the dealing of lethal blows after the deceased was felled and rendered helpless.

But there is evidence from which the jury could infer Hilyard knew Davis was alive before she began to sever Davis' head and before Hilyard committed the final act that ended Davis' life. For example, the coroner testified about forensic evidence which indicates Davis was likely alive when Hilyard began that process. There was blood in Davis' airways, which in this case illustrates she was still breathing when at least one of the cuts was made to her neck. In addition, a crime scene investigator testified that the arterial spray blood spatter patterns demonstrate Davis had blood pressure and a pumping heart when at least some of the cuts were made.

Hilyard argues the coroner never testified that evidence of life would have been apparent to a layperson; the State counters that even a layperson would understand these to be signs of a living victim. Hilyard herself testified she went back to the garage "to go make sure [Davis] was okay still" because "[she] thought [Davis] was gonna get back up." By her own admission, a reasonable juror could have inferred that before decapitating Davis, Hilyard thought Davis was "okay" and could have gotten back up.

Touching on the other *Kettler* factors, J.G. reported the attack was unprovoked. By Hilyard's account, the attack began when Davis gave her a sideways glance and flinched, which a reasonable juror could infer was no provocation at all.

There is sufficient evidence to support the jury's finding of premeditation, based on reasonable inferences from physical evidence and the testimony of witnesses, including Hilyard. We find no error below.

JURY INSTRUCTIONS

Next, Hilyard asserts the omission of additional language in a jury instruction was error. This additional language clarifies the distinction between intent and premeditation. Because Hilyard has not shown how the jury instruction, as given, was erroneous, we find no error.

*Preservation*

Hilyard did not request at trial the jury instruction she now claims to be proper. While that means the issue was not preserved for appeal, such preservation is not a prerequisite to our consideration of the merits. However, failure to preserve the issue does affect our standard of review. See K.S.A. 2021 Supp. 22-3414(3).

*Standard of Review*

> "When a party challenges a district court's failure to give a particular instruction, we review the challenge in three steps. First, we decide whether a failure to preserve the issue or a lack of appellate jurisdiction precludes us from reviewing the challenge at all.

10

Parties generally cannot raise issues for the first time on appeal. . . . But a party may raise a jury-instruction challenge for the first time on appeal under K.S.A. 2020 Supp. 22-3414(3) if the 'failure to give an instruction is clearly erroneous.' . . .

"At step two of our analysis, we evaluate the merits of the claim to determine whether the district court erred by failing to give the instruction. In this step, we examine whether the proposed instruction was both legally and factually appropriate. But we are also mindful that a party is not entitled to any proposed instruction merely because it is legally and factually appropriate. Thus, if the requested instruction is legally and factually appropriate, we must also determine whether the instructions given by the district court, considered together as a whole, properly and fairly stated the applicable law and were not reasonably likely to mislead the jury. If so, the district court's failure to give the requested instruction does not constitute error. Our review at this step is unlimited, meaning we need not defer to any conclusions that the district court made about the propriety of the instruction. If we conclude that the district court did err, then we move to step three.

"At step three, we determine whether the district court's error warrants reversal. If the party failed to request an otherwise appropriate instruction at trial, . . . the Legislature has instructed us to review only for clear error. See K.S.A. 2020 Supp. 22-3414(3) (providing that '[n]o party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires' or 'unless . . . the failure to give an instruction is clearly erroneous'). Under that standard, we will reverse a conviction only if the party firmly convinces us that the jury would have reached a different verdict had the district court given the instruction. [Citations omitted.]" *State v. Shields*, 315 Kan. 814, 819-21, 511 P.3d 931 (2022).

"The first element of this analysis ultimately affects the last one 'in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible.'" *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019) (quoting *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 [2015]).

11

Hilyard argues that the failure to give her requested instruction was clearly erroneous, and the State has not disputed her ability to raise that claim for the first time on appeal. Thus, our review is not foreclosed under the first step of the analysis, and we will reach the merits of the instructional challenge.

*Discussion*

The district court gave Hilyard's jury the standard instruction on premeditation found at PIK Crim. 4th 54.150 (2020 Supp.). It states: "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." This instruction was requested by Hilyard. She proposed no additional language.

Hilyard now argues the district court should have modified the PIK instruction by adding the following language as part of the instruction on premeditation: "Premeditation requires more than mere impulse, aim, purpose, or objective. It requires a period, however brief, of thoughtful, conscious reflection and pondering—done before the final act of killing—that is sufficient to allow the actor to change his or her mind and abandon his or her previous impulsive intentions." Hilyard's argument on this issue is based on this court's recent decision in *State v. Stanley*, 312 Kan. 557, 569, 574, 478 P.3d 324 (2020), where this court advised it was best practice to use such language when the district court *also* modifies the PIK instructions to include: "'Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned,

contrived or schemed beforehand. . . . Premeditation can occur during the middle of a violent episode, struggle or fight.'" Notably, Hilyard does not argue the district court should have included the full modifications outlined in *Stanley* in the instructions given to her jury.

The instructions as given, without the additional requested language, must constitute error for Hilyard to succeed. If the instructions given were sufficient, meaning that they properly and fairly stated the law and were not reasonably likely to mislead the jury, there is no error for an appellate court to correct. *Shields*, 315 Kan. at 821. In such a situation, *Shields* shows that it is immaterial if another instruction, upon retrospect, was also legally and factually appropriate, even if such instruction might have been *more* clear or *more* thorough than the one given. 315 Kan. at 820.

> "'The use of PIK instructions is not mandatory but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the district court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed.'" *State v. Bernhardt*, 304 Kan. 460, 470, 372 P.3d 1161 (2016) (quoting *State v. Dixon*, 289 Kan. 46, Syl. ¶ 1, 209 P.3d 675 [2009]).

Thus, a district court has discretion to modify the PIK language where such modification is legally and factually appropriate. The district courts in both *Bernhardt* and *Stanley* found a particular need to include additional language based on the facts before them. Upon our review of the facts in those cases, we ruled the additions to the

13

PIK language—and thus the jury instructions as given—remained legally and factually appropriate.

But Hilyard advances a different line of argument: that the instruction as given, without parts of the supplemental language, was erroneous. Hilyard asserts that the additional language would have been "helpful to prevent the 'blurring of the distinction between intent and premeditation,'" because of the "brawl" she asserts took place between herself and the victim. In other words, Hilyard's claim relies on the assumption that the PIK, as written, represents an insufficient statement of the law.

We disagree. While the additional language clarifies the law of premeditation in some circumstances, it does not change the core substance accurately set forth in the PIK. In *Stanley*, as in *Bernhardt,* we deemed the additional language "both a correct statement of the law and factually appropriate given the potential for juror confusion over the temporal intricacies embedded in the legal concept of premeditation." *State v. Stanley*, 312 Kan. at 565. But although the added language may enhance a jury's understanding of the law, we cannot agree that the PIK, standing alone, is an incorrect, insufficient, or unnecessarily confusing statement of the law. *State v. McDaniel*, 306 Kan. 595, 615, 395 P.3d 429 (2017) ("To be legally appropriate, 'an instruction must always fairly and accurately state the applicable law . . . .'"); *State v. Uk*, 311 Kan. 393, 401-02, 461 P.3d 32 (2020) (finding identical language "fairly and clearly sets forth the law").

A close inspection of Hilyard's rationale shows only that the jury may have found her additional instruction language "helpful" because there had been a "brawl." Even if true, it is beside the point. The existence of a brawl, fight, or disagreement at some time before the act of killing does not *require* additional assistance to the jury in every case on the issue of premeditation; the standard PIK language is legally sufficient and generally

14

not likely to mislead the jury. In both *Bernhardt* and *Stanley*, there was a temporal element that prompted the district court—in its discretion—to believe the jury may have confused the issues of intent and premeditation. Neither a temporal element, nor any other expressed reason for jury confusion has been shown here. And we must keep in mind that Hilyard does not now request the full modified instructions approved of in *Stanley* and *Bernhardt*, only a snippet. Assuming, without deciding, her proposed modified instructions remain legally appropriate, Hilyard still simply fails to show any necessity for the additional language such that the absence of that language was erroneous. The instruction given was legally appropriate and not reasonably likely to confuse the jury under the circumstances of this case.

Next, for all the reasons above that we found there was sufficient evidence to support the jury's finding of premeditation, we *also* find it was factually appropriate to give the standard instruction. *State v. Bodine*, 313 Kan. 378, 386, 486 P.3d 551 (2021) (For an instruction to be factually appropriate, there must be sufficient evidence—viewed in a light most favorable to the requesting party—to support the jury instruction.). While Hilyard's proposed instruction would also have been factually appropriate, the additional language she proposes was not necessary under the facts of this case. We find no error in the instruction given.

Given our holding that the instructions as given were sufficient—being both legally and factually appropriate—that is where our analysis ends. There was no error below, so a prejudice analysis is unnecessary.

15

In her third issue, Hilyard argues there must be an adequate showing on the record that her trial counsel received her informed consent to pursue a guilt-based defense. Otherwise, both her Sixth Amendment right to counsel and her right to a jury trial are violated and this court must reverse her conviction and remand for a new trial.

During trial, Hilyard's counsel conceded there was no question that Hilyard killed Davis. This is called a guilt-based defense. Although some form of homicide is admitted by this defense, thereby functionally relieving the State of its burden to prove to the jury beyond a reasonable doubt that Hilyard killed Davis, there may have been a good strategic reason for using such a defense. As there are different classifications of criminal homicide, some more serious than others, the admission of one element—the killing— may make a jury more amenable to a defendant's arguments about other elements of relevant charges. The guilt-based defense is sometimes used to emphasize the credibility of another defense, especially if the defendant's counsel knows the cause and manner of a victim's death seem obvious or could be proved easily.

Hilyard does not argue in her brief that she did not consent to her trial counsel's guilt-based defense. Rather, she suggests there must be a showing on the record; the record must disclose Hilyard agreed to the guilt-based defense. Without such, she argues there was ineffective assistance of counsel so much that we must reverse and remand her case for a new trial.

We find that Hilyard failed to preserve the issue and we decline to review it.

*Preservation*

Defense counsel has no right to conduct a defense premised on guilt over a client's objection. *State v. Carter*, 270 Kan. 426, 440, 14 P.3d 1138, 1148 (2000) (defense counsel's imposing a guilt-based defense against defendant's wishes violated his Sixth Amendment right to counsel and denied him a fair trial). Hilyard does not claim she objected to—or even complained of—a guilt-based defense. In fact, she may have consented to such a defense. Hilyard does not say, and we do not know. She argues simply that by judicial fiat we should create a rule which presumes there is no consent to a guilt-based defense unless that consent is made on the record. Further, she argues that without such a record, trial counsel was necessarily ineffective, and the proper remedy is a new trial.

The merits of an ineffective assistance of counsel claim are not ordinarily addressed for the first time on appeal. The usual course is a request by appellate counsel for remand to the district court for an evidentiary hearing on the ineffective assistance claim, commonly called a "*Van Cleave* hearing." See *State v. Van Cleave*, 239 Kan. 117, 120, 716 P.2d 580 (1986).

But Hilyard's counsel does not request remand for a *Van Cleave* hearing on her claim of ineffective assistance of counsel. When appellate counsel does not request a hearing, this court need not order a *Van Cleave* remand sua sponte. See *State v. Dull*, 298 Kan. 832, 839, 317 P.3d 104 (2014) (declining to remand because of appellate counsel's apparently deliberate decision not to seek a *Van Cleave* hearing, even though at least one of the defendant's arguments may require an evidentiary hearing to resolve it).

17

Hilyard's assertion that a remand is unnecessary for an appellate court to resolve the issue has rarely been successful.

"Although 'there are circumstances when no evidentiary record need be established, when the merit or lack of merit of an ineffectiveness claim about trial counsel is obvious,' and an ineffectiveness claim can therefore be resolved when raised for the first time on appeal, these circumstances are 'extremely rare.' *Rowland*, 289 Kan. at 1084-85; see also *State v. Levy*, 292 Kan. 379, 253 P.3d 341 (2011) (declining to consider ineffective assistance claims for first time on direct appeal; declining to remand for *Van Cleave* hearing based on defendant's failure to meet minimal requirements); *Laymon v. State*, 280 Kan. 430, 444, 122 P.3d 326 (2005) (direct appeal counsel's performance objectively unreasonable; performance prejudiced defendant); *Carter*, 270 Kan. at 433-34, 440-41 (trial counsel's pursuit of guilt-based defense despite client's contrary wishes ineffective, prejudicial per se)." *Dull*, 298 Kan. at 839.

The record in *Carter* established one of the "extremely rare" times the ineffectiveness claim could be resolved when raised first on appeal. But the circumstances of *Carter* are strikingly different than those present in Hilyard's case.

In *Carter*, the defendant made repeated and vigorous objections to his trial counsel's use of a guilt-based defense. Just like Hilyard's case, trial counsel admitted involvement in a homicide, but argued there was no premeditation. Unlike Hilyard, the defendant in *Carter* maintained his total innocence and complained vociferously—on the record—more than once when his defense counsel attempted to use a guilt-based defense.

This court accepted Carter's claim—raised for the first time on appeal—because the record was sufficient to decide the issue on direct appeal. The acts of counsel that Carter relied on were not in dispute and there was no purpose to a remand. *Carter*, 270

18

Kan. at 432-33. Hilyard's case is not the same. Hilyard never objected on the record to her trial counsel's use of a guilt-based strategy. Notably, she actively participated in it. Hilyard took the stand and admitted to killing Davis. The purpose of her testimony reflected her defense strategy: convincing the jury that there was no premeditation.

Simply put, Hilyard's case is not one of the "extremely rare" times an ineffectiveness claim can be resolved on direct appeal. Her complained of error is that her trial attorney did not memorialize her explicit consent to a guilt-based defense on the record. But we find no rule that says it must be so and no compelling reason to impose such a rule now. We will not create the presumption Hilyard seeks.

Conversely, there is also no rule that requires a defendant to object to a guilt-based defense on the record. Neither is there a rule creating a presumption that she has not objected to such a defense if the objection is not made on the record.

The only dispute Hilyard offers is whether she consented to the guilt-based defense; if she told her attorney she did not want to use a guilt-based defense and they used one anyway, it would certainly be ineffective assistance of counsel. Without a rule requiring either on-the-record consent or on-the-record objection, an evidentiary hearing would be the proper avenue to determine whether Hilyard opposed her trial counsel's defense strategy. Quite simply, a claim of ineffective assistance of counsel for failure to obtain consent for a guilt-based defense must be proved below. It has not been. Hilyard did not ask for a remand for an evidentiary hearing in her appeal, which she states was an intentional choice. Both her brief and her reply brief argue that "[t]he only proper remedy is to reverse and remand for a new trial." As this court demonstrated in *Dull*, absent a request from the defendant, it need not remand a case for an evidentiary

19

hearing to resolve an ineffective assistance claim raised for the first time on direct appeal. *Dull*, 298 Kan. at 839-40.

No remand for a *Van Cleave* hearing was requested and one will not be ordered sua sponte by this court.

In sum, this issue is not preserved and we decline review.

PROSECUTORIAL ERROR

In her fourth issue for review, Hilyard argues that the prosecutor misstated the law during closing arguments, which effectively shifted the burden and constituted prosecutorial error. We disagree and find no error.

*Preservation*

Hilyard did not object to the State's closing argument at trial. While this court can consider the presence—or absence—of a contemporaneous objection when analyzing an instance of alleged prosecutorial error, no objection is needed to preserve it for review. *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021).

*Standard of Review*

There are two steps to the prosecutorial error analysis:

"[T]he appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to

20

obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice . . . prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

Prosecutors fall outside their wide latitude—and thus commit error—if they misstate the law. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). Likewise, it is improper for the prosecutor to attempt to shift the burden of proof to the defendant.

A prosecutor does not shift the burden of proof to the defendant by pointing out a lack of evidence either to support a defense or to corroborate a defendant's argument about deficiencies in the State's case. Nor does a prosecutor shift the burden of proof by posing a general question about the lack of evidence offered to rebut testimony and other evidence presented by the State. The prosecutor's comment must be evaluated in context and can be mitigated by jury instructions on the burden of proof. *State v. Watson*, 313 Kan. 170, 176-77, 484 P.3d 877 (2021).

*Discussion*

In Hilyard's case, the district court instructed the jury on three lesser included offenses, including second-degree intentional murder, second-degree reckless murder, and involuntary manslaughter. It also properly instructed the jury on the law, explaining that if the jury had a reasonable doubt between a greater and lesser offense, it could only convict of the lesser.

21

During the State's closing argument, the prosecutor discussed the jury's options between the charge of premeditated first-degree murder and the three lesser included offenses. He also properly explained, "it is for you to determine the weight and credit to be given the testimony of each witness."

Later, the prosecutor specifically addressed with the jury the lesser included offenses of second-degree reckless murder and involuntary manslaughter:

> "These other two statutes—excuse me, other two options are reckless murder, which says you do something recklessly, and here's the definition, and then there's a definition of involuntary manslaughter, which gives a lesser—a lesser degree of recklessness. This applies *if you believe that Ms. Hilyard truly didn't know* [*Davis*] *was still alive* and just recklessly disregarded the fact that she was a living, breathing human being when she slit her throat." (Emphasis added.)

And he continues, circling back to the jury's role:

> "Again, instruction two, you judge the credibility of all witnesses. On this day this woman attacks from behind, without provocation, this is according to [J.G.]. And you can judge [J.G.]'s credibility and how many other things he got right. Without any provocation this woman attacks his grandmother, beats her to the ground, and when she's unable to defend herself she takes—she goes back in the house, makes a decision, goes back in the house, gets a knife, makes sure that the garage door is down and then she is determined to do what she did until she has completed the task. I'm asking you to find this woman guilty of first degree premeditated murder."

Hilyard only complains about the emphasized language above, "if *you believe* that Ms. Hilyard truly didn't know [Davis] was still alive." She contends that this both

22

misstates the law and shifts the burden from the State to herself because "the jury didn't have to believe anything in order to convict Ms. Hilyard of the lesser included offense— it only had to form a reasonable doubt that the state proved intent and premeditation." Hilyard argues that this statement shifted the burden in a way that the jury could only convict of the lesser offense if it believed that the defense proved something, i.e., whether Hilyard knew Davis was still alive.

But the State did not say the jury had to believe the *defense* proved anything. Rather, the prosecutor was explaining which lesser offense might apply depending on the determinations the jury made about the evidence. As the State points out, it is like the prosecutor saying "if you find" rather than "if you believe." In other words, if the *State* failed to prove to the jury that Hilyard *did know* Davis was still alive (i.e., if the jury believed/found Hilyard *did not know* Davis was still alive), a lesser included offense might apply.

To any extent the prosecutor *was* referring to believing Hilyard specifically, it would not have been burden shifting; it would have been in the context of the jury's role of determining the weight and credit to be given to the testimony of each witness. While prosecutors are not allowed to offer personal opinions on credibility, this court has held that a prosecutor may explain the legitimate factors which a jury may consider in assessing witness credibility and may argue why the factors present in the case should lead to a compelling inference of truthfulness. *State v. Williams*, 299 Kan. 911, 935-37, 329 P.3d 400 (2014).

Just after the "believe" language, the prosecutor highlighted the factors which could compel the jury to believe J.G.'s truthfulness and which simultaneously undercut Hilyard's own testimony. Just like in *Williams*, the prosecutor's statements here, when

23

placed in context, permissibly directed the jury to the evidence that boosted or degraded the credibility of the witnesses. We find no error.

MENTAL EVALUATION

Finally, Hilyard argues the district court's failure to order a mental evaluation under K.S.A. 2016 Supp. 22-3429 constitutes an abuse of discretion which requires this court to reverse her sentence and remand with directions for the district court to order an evaluation according to the statute. K.S.A. 2016 Supp. 22-3429 states in full:

> "After conviction and prior to sentence and as part of the presentence investigation authorized by K.S.A. 21-6703, and amendments thereto or for crimes committed on or after July 1, 1993, a presentence investigation report as provided in K.S.A. 21-6813, and amendments thereto, the trial judge may order the defendant committed for mental examination, evaluation and report. If the defendant is convicted of a felony, the commitment shall be to the state security hospital or any suitable local mental health facility. If the defendant is convicted of a misdemeanor, the commitment shall be to a state hospital or any suitable local mental health facility. If adequate private facilities are available and if the defendant is willing to assume the expense thereof, commitment may be to a private hospital. A report of the examination and evaluation shall be furnished to the judge and shall be made available to the prosecuting attorney and counsel for the defendant. A defendant may not be detained for more than 120 days under a commitment made under this section."

*Preservation*

Hilyard did not raise this issue below. She neither requested a mental evaluation under K.S.A. 2016 Supp. 22-3429 nor did she object to the lack of such an evaluation. Generally, this court will not consider legal theories not raised in the court below. *State v.*

24

*Perkins*, 310 Kan. 764, 768, 449 P.3d 756 (2019). But Hilyard now argues this court can reach the issue for the first time on appeal because the failure to do so would lead to the denial of a fundamental right. In so arguing, she effectively claims our court should apply a discretionary exception to the preservation rule. This court will sometimes review unpreserved claims when: (1) "The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case"; (2) consideration of the question is "necessary to serve the ends of justice or to prevent the denial of fundamental rights"; or (3) the judgment of a trial court should be upheld on appeal as "right for the wrong reason." *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

Here, the second factor applies, as we agree a fundamental right is implicated. We choose to exercise our discretion to consider Hilyard's issue. Therefore, it is under the second exception we now review her claim.

*Standard of Review*

A district court's decision on whether to order an evaluation under K.S.A. 2021 Supp. 22-3429 is reviewable for abuse of discretion. *State v. Evans*, 313 Kan. 972, 992, 492 P.3d 418 (2021).

*Discussion*

K.S.A. 2021 Supp. 22-3429 provides, in part, "[a]fter conviction and prior to sentence and as part of the presentence investigation authorized by K.S.A. 2021 Supp. 21-6703 . . . the trial judge may order the defendant committed for mental examination,

evaluation and report. If the defendant is convicted of a felony, the commitment shall be to the state security hospital or any suitable local mental health facility."

Then, if the report of the examination authorized by K.S.A. 2021 Supp. 22-3429 shows

> "the defendant is in need of psychiatric care and treatment, that such treatment may materially aid in the defendant's rehabilitation and that the defendant and society are not likely to be endangered by permitting the defendant to receive such psychiatric care and treatment, in lieu of confinement or imprisonment, the trial judge shall have power to commit such defendant to: (1) The state security hospital or any county institution provided for the reception, care, treatment and maintenance of mentally ill persons, if the defendant is convicted of a felony." K.S.A. 2021 Supp. 22-3430.

In *Evans*, the defendant went a step further than Hilyard by filing a request for a mental evaluation under K.S.A. 22-3429. The district court considered the motion but denied it. Evans argued the trial court needed to explain its reason for denying the request and its failure to do so constituted an abuse of discretion.

Our holding in *Evans* was clear:

> "Under Evans' reasoning, mental evaluations would be the rule, and not ordering them would be an exception subject to close appellate scrutiny. In practical effect, Evans asks this court to establish a rule that all requests for presentencing mental evaluations must be granted unless the trial court can state some compelling reason not to grant the request. We decline to impose such a burden on sentencing courts. No such rule is contained in the statutory language, and such a rule would be contrary to the plain language of the statute, which says that "the trial judge *may* order the defendant committed for mental examination, evaluation and report." K.S.A. 2020 Supp. 22-3429.

26

"The statutory evaluation scheme is clearly permissive, and *it is the defendant's burden* to persuade a sentencing court that a mental examination serves the interests of justice. When a party presents no facts and makes no argument to support its request for relief, an issue may be deemed abandoned. Furthermore, . . . surely Evans had some burden to establish a record of her argument and the findings that led to its rejection. . . .

"Simply asserting that the trial court denied a request does not elevate an issue to the status of preserved for appeal. . . .

"Here, Evans never stated any grounds to the trial court why it should grant her request for a mental health evaluation. She created no record in support of her motion, and she essentially abandoned the argument below. For these reasons, this issue fails to present reversible error." (Emphasis added.) *Evans*, 313 Kan. at 992-93.

Hilyard did not request a mental examination, let alone meet her burden to persuade the sentencing court to order a mental examination. The statute imposes no affirmative duty for courts to raise this issue sua sponte and whether to do so is clearly discretionary. There is no indication the sentencing judge was unaware of this discretion. There is no error.

## CONCLUSION

Hilyard is not due the relief she now seeks. There was sufficient evidence to support the jury's finding of premeditation, no jury instruction error, and no prosecutorial error. Her claim of ineffective assistance of counsel is not properly preserved. The trial court did not abuse its discretion in denying her request for a mental health evaluation.

The conviction and sentence are affirmed.