NOT DESIGNATED FOR PUBLICATION

No. 126,617

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JESUS JAVIER CARRILLO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS, judge. Submitted without oral argument. Opinion filed November 1, 2024. Affirmed.

*Sean P. Randall*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and CLINE, JJ.

PER CURIAM: Jesus Javier Carrillo challenges the district court's revocation of his probation because he claims his counsel's legal assistance at the probation violation hearing was constitutionally ineffective and the district court abused its discretion when revoking his probation. Carrillo has not persuaded us on either claim, so we affirm his conviction.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On March 8, 2022, Carrillo pled no contest to possession of methamphetamine, a severity level 5 drug felony. As part of his plea agreement, a second charge for possession of drug paraphernalia was dismissed with prejudice. A few weeks later, the district court granted Carrillo's dispositional departure motion and sentenced him to 40 months in prison but granted him probation on that sentence for a term of 12 months. Carrillo's probation period began on April 29, 2022.

On September 1, 2022, Carrillo's Intensive Supervision Officer (ISO) filed an affidavit alleging Carrillo had violated his probation by:

- Failing to appear for office visits with his ISO in May 2022 and June 2022;
- Providing a urine sample which tested positive for marijuana on May 23, 2022;
- Failing to provide a required urine sample on June 1, 2022;
- Failing to report to his ISO within 24 hours of release from custody (Carrillo was released on August 22, 2022, after serving a 60-day sanction in a municipal court case but did not contact his ISO until August 31, 2022);
- Failing to make any payment towards his court costs as of August 31, 2022; and
- Failing to report to a drug treatment facility for a scheduled inpatient bed date on August 23, 2022, pursuant to the recommendations of his drug and alcohol evaluation.

The State moved to revoke Carrillo's probation.

On September 23, 2022, the district court convened for an evidentiary hearing concerning the alleged violations. Carrillo appeared with counsel, Samuel Podrebarac, who told the court Carrillo intended to deny the allegations but they were not ready to

proceed to evidence. Podrebarac explained that he needed more time to discuss the affidavit supporting the probation violation allegations with Carrillo since Carrillo denied receiving the letter Podrebarac had sent Carrillo with the affidavit. The court said it would allow the State to put on evidence because the State's witnesses were present, but it would hold off on disposition until after Podrebarac was able to discuss the allegations with Carrillo.

The district court then took a break to hear other cases and allowed Podrebarac time to speak with Carrillo and review relevant documents. When the hearing reconvened, the court asked Podrebarac whether he was comfortable proceeding with the presentation of the State's evidence and continuing the disposition until a later date. Podrebarac asked the district court, "So, you won't send him to prison today then, or?" The court agreed and said it would continue the hearing implying that Carrillo would be able to present his case later. Podrebarac responded, "We're good then."

The State presented evidence supporting the allegations in the ISO's affidavit, along with more alleged violations. For instance, the ISO testified Carrillo had another positive urinalysis test for marijuana on September 13, 2022. The ISO also explained Carrillo served the 60-day jail sentence because the municipal court had revoked his probation in his municipal court case. And the ISO said Meade County had issued an arrest warrant for Carrillo's violation of his bond in yet another case—relating to charges that included stalking—in that county. The ISO pointed out two law enforcement officers from Meade County were sitting in the audience at the hearing who the ISO presumed were there to arrest Carrillo on the Meade County warrant.

Podrebarac cross-examined the ISO about the violation allegations. He asked whether the ISO knew Carrillo had difficulties getting to the ISO's office because Carrillo did not have a driver's license. He also pointed out Carrillo's inability to pay court costs

while serving his 60-day sentence. And he noted Carrillo had scheduled an outpatient treatment date for September 26, 2022.

After the State concluded its presentation of evidence, the district court asked Podrebarac if he intended to present evidence. He said yes, he knew he wanted to call Carrillo and his girlfriend. The court then continued the rest of the hearing to a later date.

Before the hearing reconvened, Carrillo's ISO filed amended affidavits which alleged more probation violations. These included testing positive for THC on September 13 and October 19, 2022, testing positive for amphetamines and methamphetamines on December 12, 2022, and January 13, 2023, and admitting to drinking alcohol on December 10, 2022.

On March 17, 2023, the district court reconvened to continue the probation violation evidentiary hearing. The court allowed the State to put on evidence about the additional probation violation allegations mentioned in the ISO's amended affidavits. The ISO also testified Carrillo missed an office visit on February 1, 2023, and served a jail sanction on December 10-13, 2022, after admitting he had drunk alcohol. While the ISO testified Carrillo did not report within 24 hours of his release from jail, she said Carrillo contacted her on December 14 to explain he was sick and intended to get a COVID test. Yet his ISO recounted in a letter that was admitted as one of the State's exhibits about how she struggled to get verification from Carrillo on his illness, eventually receiving verification on December 23 that Carrillo had tested positive for COVID on December 15. In this letter, his ISO stated Carrillo did not report for scheduled meetings with her or urinalysis testing for several weeks after his release from jail in December, claiming he was still sick with COVID. Yet she saw on Facebook that Carrillo had attended a social event during this time.

4

The ISO testified Carrillo completed outpatient treatment by March 2023 but did not complete inpatient treatment because he claimed he had to work to pay bills and take care of family obligations. She also said he struggled with probation because of addiction. She explained how she had discussed Carrillo's violations with him, but he always seemed to have an excuse and he failed to be accountable for his mistakes. Given this, she did not believe his performance would improve if he was allowed more time on probation. She recommended Carrillo's probation be revoked.

On cross-examination, Podrebarac focused on the positive aspects of Carrillo's performance on probation. He elicited admissions from Carrillo's ISO on the following matters:

- Some of Carrillo's reasons for his failure to attend office visits were possible and transportation had been a struggle for Carrillo;
- Carrillo had professed confusion about when and why he was to report after being released from jail;
- Carrillo's most recent urinalysis was presumptively positive for only THC (and no other illegal substances);
- Carrillo had successfully completed outpatient treatment on March 1, 2023;
- Carrillo had worked for at least the majority of his probation;
- Other than the March 15, 2023 urinalysis, Carrillo's test results after the ISO's last amended affidavit on January 25, 2023, were negative;
- Both Carrillo and his girlfriend communicated a lot with the ISO via text message;
- On June 1, 2022, while Carrillo missed his visit with his ISO, he did not ignore his urinalysis test. Rather, he was supposed to arrive by 4:30 p.m. but did not show up until 4:50 p.m. and had not contacted his ISO to say he was running late; and

5

- Carrillo took positive steps as his probation term progressed by not appearing late for his ISO office visits as often as he had in the beginning.

Before Carrillo testified, his counsel provided testimony from several other witnesses to develop a narrative that Carrillo wanted to make progress towards improving his life and avoiding mistakes.

Carrillo's treatment counselor told the district court Carrillo missed some sessions due to illness, but he successfully completed treatment in March. The counselor also stated Carrillo expressed wanting to avoid jail and would go to intermediate treatment if necessary. And a representative from Carrillo's employer told the district court Carrillo was a good worker.

Continuing with the theme of making progress, Podrebarac called Carrillo's girlfriend to testify that Carrillo tried to better himself every day. Through her testimony, Podrebarac highlighted various ways Carrillo had tried to improve.

Then, Carrillo testified. Podrebarac largely presented Carrillo an opportunity to defend his actions and explain his denial of some allegations. Podrebarac also reiterated Carrillo's denial of other allegations. He questioned Carrillo about the list of probation conditions he was given on April 29, 2022, and asked him to give the reasons for his behavior.

Carrillo admitted he did not read the written probation conditions he was given and that his failure to comply with the document he signed was problematic. He then attempted to describe his misunderstandings about what he needed to do and how he had improved. For instance, he claimed he did not understand he had to report within 24 hours of his release from custody. He instead thought he had to show up after his release on the day he was slotted to take a urinalysis test. After that incident, he said he sent his

6

ISO a message every time he was released to let her know he was out. He also contended he was unaware of the scheduling of his inpatient treatment upon his release from custody. He discussed his transportation challenges and gave an example of a time when his alarm was set incorrectly and said he sent his ISO a photo of it to show the mistake. He said he received conflicting information about the amount of court costs he owed but admitted he had made only one payment because he had expenses for his children's education and his bond payment. Due to those expenses, he claimed he had to enroll in outpatient treatment because after spending 60 days in jail he could not afford to spend another 30 days without an income while in inpatient treatment.

As he continued his testimony, Carrillo admitted having a beer in December 2022, but Podrebarac solicited testimony about how Carrillo tried to prevent relapse by working, participating in his kid's sports, assisting his mother, and keeping his mind on doing positive things. As a final question, Podrebarac asked Carrillo, "Why do you think you deserve another chance at probation? We're here almost a year later. What—what is going to be different that—what's going to be different, Mr. Carrillo?" to which Carrillo responded that he would join a treatment class, stay clean, stay positive, and work.

Two of Carrillo's children testified about their relationship with Carrillo generally and said they loved him.

In making its decision, the district court said it sympathized with Carrillo's situation. The court also noted Carrillo's work ethic. While it acknowledged that "humans make mistakes," the court found two aspects for success missing: (1) an understanding by Carrillo of what he must do to be successful, and (2) a showing by Carrillo that he is making changes towards doing that. The court pointed out that since starting probation in April 2022, Carrillo had violated his probation at least once every month. The court found that Carrillo did not take accountability for his actions and believed things were other people's fault. It pointed out that Carrillo had also failed his probation in his

7

municipal court case and probation did not seem to be working in this case. After finding Carrillo was not going to be successful on probation, the court revoked his probation and ordered that he serve his underlying sentence.

Carrillo timely appealed.

REVIEW OF CARRILLO'S APPELLATE CHALLENGES

*Carrillo's ineffective assistance of counsel claim*

Before we delve into the merits of Carrillo's claim, we note that it is unpreserved. And generally appellants cannot raise ineffective assistance of counsel claims for the first time on appeal. *Trotter v. State*, 288 Kan. 112, Syl. ¶ 10, 200 P.3d 1236 (2009). But our Supreme Court has exercised its discretion to review unpreserved constitutional claims like Carrillo's in three circumstances:

> "'(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason.' [Citations omitted.]" *State v. Z.M.*, 319 Kan. 297, 312, 555 P.3d 190 (2024).

Like the court did in *Z.M.*, we exercise our discretion to consider Carrillo's claim because it implicates his fundamental right to counsel and is a case-dispositive question of law based on undisputed facts. 319 Kan. at 312.

*An Ineffective Assistance of Counsel Claim based on a* Cronic *exception*

Both district and appellate courts examine ineffective assistance of counsel claims the same way: They determine first whether defense counsel erred and, if so, whether

that error prejudiced the defendant's right to a fair trial. *Trotter*, 288 Kan. 112, Syl. ¶ 10. The defendant bears the burden to prove both parts of this test. *Z.M.*, 319 Kan. at 313.

Under what is known as the "*Cronic* exception," we presume the defense was prejudiced under certain circumstances given the magnitude of counsel's deficiency: "(1) when there is a 'complete denial of counsel' at a critical stage; (2) when 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing'; and (3) if it would not be possible for a competent lawyer to provide effective assistance." 319 Kan. at 314 (quoting *United States v. Cronic*, 466 U.S. 648, 659-60, 104 S. Ct. 2039, 80 L. Ed. 2d 657 [1984]). The *Cronic* exception is very narrow and reserved for instances where counsel completely failed to be an advocate. *Edgar v. State*, 294 Kan. 828, 840, 283 P.3d 152 (2012) (citing *Florida v. Nixon*, 543 U.S. 175, 189, 125 S. Ct. 551, 160 L. Ed. 2d 565 [2004]).

To support his claim, Carrillo alleges various errors by Podrebarac during his probation violation hearing. Carrillo asks us to assume these errors prejudiced his case under the second type of *Cronic* exception because, according to him, Podrebarac "failed to function in any meaningful sense as the Government's adversary." The State contends Carrillo is relying on isolated or imagined errors, which do not amount to a complete failure or abandonment of Carrillo's cause. It points out that Podrebarac cross-examined the State's witnesses, presented five defense witnesses, and gave Carrillo a chance to explain his actions and why continued probation was a viable option.

> *The record does not show Podrebarac pursued a guilt-based defense against his client's wishes.*

To begin, Carrillo maintains Podrebarac abandoned his role as Carrillo's advocate by pursuing a guilt-based defense against Carrillo's wishes. Carrillo noted that he denied the alleged violations when he first appeared in court and multiple points thereafter.

9

Under K.S.A. 22-3716(b)(2), according to Carrillo, "hearings are only necessary when a probationer refuses to admit he violated the terms of his probation." Yet he says Podrebarac's comments at the end of the hearing—when Podrebarac said, "Judge, as the evidence from today, I think you can make a finding that my client is a probation violator,"—were contrary to Carrillo's position and demonstrate Podrebarac unilaterally pursued a guilt-based defense. He also claims Podrebarac's comment on the first day of the hearing—when Podrebarac said, "Okay. So, you won't send him to prison today then . . . ?"—was an admission of Carrillo's guilt.

Carrillo analogizes his case to the situation in *State v. Carter*, 270 Kan. 426, 14 P.3d 1138 (2000). In *Carter*, our Supreme Court held that defense counsel has no right to conduct a defense premised on guilt over a client's objection. 270 Kan. at 440. It explained that pursuing such a defense under these circumstances not only overrides a defendant's plea of not guilty but also relieves the State of the burden to prove a defendant's guilt beyond a reasonable doubt. 270 Kan. at 441.

In *Carter*, the defendant was charged first-degree murder and, in the alternative, felony murder (among other offenses). Carter denied having any part in the charged offenses. But in his opening statement, his counsel said Carter was involved but denied that he premediated the shooting of the victim in an effort to steer the jury towards to felony murder conviction. 270 Kan. at 429. During a recess, Carter told the district court he maintained his innocence and disagreed with his counsel's trial strategy in telling the jury he was guilty. 270 Kan. at 432-33. Our Supreme Court found counsel's actions per se prejudicial under the *Cronic* exception because "imposing a guilt-based defense against defendant's wishes violated defendant's fundamental right to enter a plea of not guilty and deprived the defendant of effective assistance of counsel." 270 Kan. 426, Syl. ¶ 4.

Carrillo, however, overestimates the similarities between his case and *Carter*. Unlike *Carter*, the record does not convey that Carrillo "maintained his total innocence

10

and complained vociferously." See *State v. Hilyard*, 316 Kan. 326, 338, 515 P.3d 267 (2022). While Carrillo blames Podrebarac for conceding that Carrillo violated probation, Carrillo admitted he violated the terms of his probation at various points in his testimony:

- When asked about the allegation that he failed to report to his ISO after being released from custody, Carrillo admitted he did not report and explained that he was confused because he "didn't read the conditions right that [he] signed."
- Carrillo admitted missing some visits with his ISO but claimed he was simply late on most of the occasions his ISO alleged he missed visits. He even explained how he sent his ISO a picture of his alarm to show her it was wrong, which was why he missed one meeting.
- When asked about failing to pay his court costs, Carrillo contended he had made one payment but admitted he had not paid as required because he claimed he did not earn much and had other bills to pay.
- When asked about his failed urinalysis tests, Carrillo admitted he has "a problem with, obviously, with consuming drugs" but claimed he tried to get help.
- Carrillo admitted he failed to follow the recommendation from his drug and alcohol evaluation that he complete inpatient treatment because he claimed he needed to work to pay his bills.
- Carrillo admitted drinking alcohol while on probation, which violated one of the terms.

In fact, before the district court gave its ruling, Carrillo told the district court, "Like I told [the ISO], and I've had this talk with her before, I want to better myself and—and not have these issues, because I have—I have them I have to help, you know, come up and be somebody and not be doing mistakes I did." And then Carrillo ends his

11

brief statement by telling the district court, "I know I made mistakes. And, yeah, everybody does. But, I'm only human. I'm not perfect."

Rather than conflict, Carrillo's testimony aligns with Podrebarac's strategy. Podrebarac's questions appeared calculated to show Carrillo had not intentionally flouted his probation conditions, was demonstrating accountability for his mistakes, and had attempted to improve and prevent future mistakes.

Carrillo also fails to provide the full context of his counsel's comments at the outset and conclusion of his probation violation hearing. As for the first day of the hearing, a more complete review of the record reveals his counsel was clarifying the judge's intentions if they proceeded with the State's evidence that day. Podrebarac did not admit Carrillo violated probation—instead, he told the court Carrillo intended to deny the allegations but they were not ready to present evidence that day. And regarding Podrebarac's comments at the end, the district court asked for recommendations from the parties after hearing the evidence. When it was time for Podrebarac to speak, he said:

> "I know after my statement, Mr. Carrillo would like to make a statement before you make a decision on disposition.
>
> "Judge, as the evidence from today, I think you can make a finding that my client is a probation violator. He has informed me that he would want another opportunity of this.
>
> "He would ask that you revoke, reinstate him for a new 12-month period of probation, and that's what he would ask in this matter. Thank you."

When the quote is given its full context, it aligns with Carrillo's testimony. That is, Carrillo admitted he made mistakes, but he wanted another opportunity to show the court he could succeed on probation.

12

The record does not reveal a situation like in *Carter*, and Carrillo has not persuaded us that his counsel "abandoned" his role as advocate by pursuing a guilt-based defense against Carrillo's wishes.

*The record does not show Podrebarac completely failed to be an advocate for Carrillo.*

Carrillo says Podrebarac "repeatedly abandoned his role as an advocate for his client" throughout the probation violation hearing. According to Carrillo, Podrebarac failed to object to hearsay, discredited Carrillo's girlfriend's testimony, failed to call a witness only to accommodate the State, and impugned Carrillo's testimony. But Carrillo overstates the record and fails to persuade us that these isolated instances rise to the level of a complete failure of advocacy.

1. *Laboratory results confirming one of Carrillo's failed urinalysis tests*

While admitting his ISO could discuss the results of any urinalysis tests she administered herself, Carrillo claims testimony about laboratory tests performed by others was inadmissible hearsay under K.S.A. 2023 Supp. 60-460. Carrillo complains his counsel did not object when the State admitted the laboratory report with the result of his January 19, 2023 urinalysis test, which revealed he tested positive for methamphetamine and amphetamine. The State's exhibit 5 was an Order to Arrest and Detain signed by Carrillo's ISO, which stated Carrillo violated the terms of his probation with this positive test, to which the laboratory report was attached. Carrillo claims there was "no reasonable trial strategy to allow the introduction of these laboratory tests." Carrillo argues Podrebarac's failure to object to questionable hearsay shows a lack of advocacy on Carrillo's behalf.

13

In response, the State relies on *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). There, the United States Supreme Court explained that establishing a presumption of prejudice under the *Cronic* exception requires a showing of "the 'complete denial of counsel'" and allegations of error at specific points in the attorney's representation do not qualify. 535 U.S. at 695. Instead, specific complaints are handled under the general rules for evaluating counsel's performance established in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1982)—that is, whether the error prejudiced the defendant's right to a fair trial. *Bell*, 535 U.S. at 696-98.

So even if we assume that Podrebarac made a mistake in failing to object to this evidence, this one instance is an insufficient basis to find Podrebarac "abandoned his role as advocate." Both the United States and Kansas Supreme Courts recognize the difference between failing to oppose the prosecution "as a whole," which would implicate *Cronic*, and failing to oppose the prosecution "at specific points," which would implicate *Strickland*. *Bell*, 535 U.S. at 697; *Z.M.*, 319 Kan. at 316 ("'In the wake of *Bell*, courts have rarely applied *Cronic*, emphasizing that only non-representation, not poor representation, triggers a presumption of prejudice.'") (quoting *Miller v. Martin*, 481 F.3d 468, 473 [7th Cir. 2007]). The error Carrillo asserts is governed by *Strickland* not *Cronic*, and, as explained below, we fail to find other errors which, when combined with this one, demonstrate a complete denial of counsel at the hearing.

## 2. *Discrediting testimony of Carrillo's girlfriend*

Carrillo next claims Podrebarac undercut the testimony of his girlfriend. The State does not specifically respond to this argument, but a review of the record shows Carrillo quotes only part of the examination and takes it out of context. Viewing the entire portion of this testimony, the record does not show Podrebarac was "discrediting" the girlfriend's testimony. Rather, the transcript reflects Podrebarac was trying to encourage Carrillo's girlfriend to highlight Carrillo's attempts to "better himself" on probation:

"Q    What have you seen Mr. Carrillo do while on probation that shows that he's trying to better himself?

"A    Oh, um . . . he tries to better himself every day, you know, for his kids, getting up, going to work, going to check in, doing what he has to do. He tries every day.

"Q    You stated that you knew about the positive [urinalysis test results]. Are you aware of anything else that would indicate that Mr. Carrillo has been struggling on supervision—or, probation, I mean?

"A    What do you mean?

"Q    I'll retract the question. What is Mr. Carrillo doing currently to overcome his struggles so that he can be successful on probation?

"A    I think—well, going to work. You know, going to work, doing what he has to do. I do see a lot—I do see him try every day. Yeah.

"Q    What—what do you see every day, or what efforts are you seeing every day that make you say he's trying?

"A    Well, just how he talks, how he—how he talks about the future, how he wants to be better, how his kids are a big motivation. Yeah. How he wants to change.

"Q    Do you see—you stated that you said you hear him say these words and statements to better himself.

"A    Yes.

"Q    What actions have you seen Mr. Carrillo take to—to better himself?

"A    Well, I've seen him, you know, work—work—work—do projects. Or, really put all his energy into work, or try to be distracted. You know, try to keep himself busy."

We do not find this line of questioning demonstrates the error Carrillo alleges. But even if we did, we also do not find it—either in isolation or combined with the failure to object to the hearsay evidence—shows Podrebarac completely abandoned him.

### 3. *Failing to call another ISO witness*

Carrillo also complains that Podrebarac did not call another ISO witness in his defense. He claims the State had mistakenly released this witness, and Podrebarac did not take the State up on its offer to get the second ISO to come back to court. Carrillo says

15

Podrebarac asked Carrillo whether he wanted the second ISO there, and Carrillo simply "shrugged his shoulders" in response. Carrillo then argues Podrebarac did not articulate a good reason for deciding the second ISO's testimony was no longer needed when the State asked if it should call the ISO back.

Again, this is another alleged isolated error that does not evidence Podrebarac completely failed him. Further, Carrillo fails to preserve any claim of error because he does not explain what testimony this second ISO could have provided or how that testimony would have helped his defense. By failing to develop the record below or adequately brief the issue, we find it is waived. *State v. Logsdon*, 304 Kan. 3, 29, 371 P.3d 836 (2016). ("[A] failure to adequately brief an issue results in abandonment or waiver.").

### 4. *Impugning Carrillo's testimony*

Carrillo claims the most egregious example of how his counsel completely failed him was Podrebarac's "treatment of [Carrillo's] testimony." He says Podrebarac "cut down and discounted" his testimony while examining him. But he again misconstrues the record.

For this claim, Carrillo argues that Podrebarac continued to confront him about his violations, despite Carrillo's denial of the allegations. He cites several examples in his testimony where Podrebarac asked him about his difficulties in complying with the probation terms, including asking why Carrillo did not contact his ISO once released from jail and other times when he failed to report to his ISO or appear for a urinalysis test. At times, when Carrillo admitted certain failures, Carrillo complains that Podrebarac asked if Carrillo understood his actions were "problematic." He characterizes these exchanges as examples where Podrebarac "shifted the blame" for Carrillo's actions to Carrillo. But the exchanges he relies on again align with the apparent strategy to show the

16

district court that Carrillo was taking responsibility for his actions and deserved another chance on probation.

Carrillo also cites an exchange where Podrebarac asked about his positive urinalysis tests, claiming his counsel was "help[ing] the State prosecute" Carrillo. But Carrillo takes this testimony out of context. A broader look at the exchange reveals Podrebarac was asking Carrillo about the third phase of his outpatient treatment, which is relapse prevention. After discussing that Carrillo had some positive urinalysis tests while on probation (which Carrillo admitted), Podrebarac then asked Carrillo what he was doing to prevent relapse. Carrillo provided details about his efforts to prevent relapse, then Podrebarac asked Carrillo to explain why he had problems on probation and what he had done to ensure he could be successful on probation. Rather than contradicting Carrillo, this appears to be another attempt to provide Carrillo a platform to show the district court he could be successful on probation if given another chance.

Last, Carrillo again points to Podrebarac's word choice in closing—claiming he failed to advocate for Carrillo and "removed his participation from the case, emphasizing to the court that he was not here to advocate for Mr. Carrillo" because Podrebarac said:

> "*He* has informed me that *he* would want another opportunity of this. *He* would ask that you revoke, reinstate him for a new 12-month period of probation, and that's what *he* would ask in this matter."

Carrillo says because Podrebarac used the word "he" instead of "we" this means Podrebarac was not defending Carrillo but was suggesting Carrillo alone was asking the court to reinstate his probation. We do not read the record the same way. These statements simply tell the court how Carrillo—the client—wants the court to dispose of the case. We do not read the statements to indicate that Podrebarac was distancing himself from his client's position or that he disagreed or had an opinion on it. Indeed,

17

counsel's opinions are not relevant nor do they provide an appropriate basis on which the district court can make its decision. We disagree with Carrillo's strained interpretation of these comments.

Carrillo has not persuaded us that Podrebarac completely failed to be an advocate for him during his probation violation hearing. Overall, the record reveals Podrebarac tried to explain the probation violations and establish continued probation as a viable option. Podrebarac cross-examined the State's witnesses, presented his own witnesses, and asked the district court to impose an additional probationary period. Carrillo has simply not met his burden on this claim.

*When the district court revoked Carrillo's probation, did it abuse its discretion?*

*Standard of Review*

Generally, after a violation a district court may revoke an offender's probation. *State v. Tafolla*, 315 Kan. 324, 328, 508 P.3d 351 (2022). The district court can in its discretion impose the original sentence unless limited by statute. Appellate courts review a district court's probation violation sanction for abuse of discretion. 315 Kan. at 328. Judicial action by a court is abuse of discretion when:

> "(1) it is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would take the view adopted by the district court; (2) it is based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) it is based on an error of fact, i.e., substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023).

See *Tafolla*, 315 Kan. at 328 (discussing abuse of discretion for a district court).

The party challenging abuse of discretion bears the burden of establishing it. See *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

*Carrillo cannot establish the district court abused its discretion.*

Carrillo argues the district court's decision was unreasonable, which means he must establish "no reasonable person would take the view adopted by the district court." *Bilbrey*, 317 Kan. at 63. To support his claim, he maintains that he had made progress while on probation and was nearing the end of his probationary term when it was revoked. He also notes the district court was not "required" to revoke his probation by statute and had the authority to impose lesser sanctions, such as a quick-dip 2-to-3-day jail sanction, a jail sanction of up to 60 days, or it could have continued, extended, or modified his probation.

But just because the district court had other options available does not mean it acted unreasonably in revoking Carrillo's probation under K.S.A. 22-3716(c)(7). See *Tafolla*, 315 Kan. at 328. We cannot say that no reasonable person would agree with the district court under these circumstances. Carrillo testified about several barriers to his success on probation—such as transportation, income, and his issues with drug abuse—which he had not completely overcome by the time his probation violation hearing reconvened. And as the district court noted, Carrillo violated his probation at least every month up through the second day of his hearing—even after the State moved to revoke his probation. While we—like the district court—sympathize with Carrillo's situation, we are not persuaded that the district court abused its discretion to revoke his probation given these facts.

19

We therefore affirm the district court's decision to revoke Carrillo's probation and impose his underlying sentence.

Affirmed.